IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

- - - - -

David Stults and       :
Barbara Stults,
                       :
    Plaintiffs,
                       :
    vs.                Case No. C09-4100 DEO
                       :
American Pop Corn Co.,
et al.,                :

    Defendants.        :

- - - - -

DEPOSITION OF CHARLES A. PUE, M.D.

- - - - -

Taken at Spectrum Reporting LLC
333 Stewart Avenue
Columbus, OH 43206
September 13, 2013, 9:00 a.m.

- - - - -

Spectrum Reporting LLC
333 Stewart Avenue, Columbus, Ohio 43206
614-444-1000 or 800-635-9071
www.spectrumreporting.com

- - - - -

**EXHIBIT A**

Realtime - Videoconferencing - Trial Presentation - Video
Spectrum Reporting LLC

```
 1              A P P E A R A N C E S
 2
    ON BEHALF OF PLAINTIFFS:
 3
        Humphrey, Farrington & McClain, P.C.
 4      221 West Lexington Avenue, Ste. 400
        Independence, MO 64050
 5      By Scott B. Hall, Esq.
 6
    ON BEHALF OF DEFENDANT SYMRISE, INC.:
 7
        Swanson, Martin & Bell, LLP
 8      330 North Wabash, Ste. 3300
        Chicago, IL 60611
 9      By David E. Kawala, Esq.
10
    ON BEHALF OF DEFENDANTS BUSH BOAKE ALLEN, INC. AND
11  INTERNATIONAL FLAVORS AND FRAGRANCES, INC.
12      Weinberg, Wheeler, Hudgins, Gunn & Dial, LLC
        3344 Peachtree Road, Ste. 2400
13      Atlanta, GA 30326
        By Thomas D. Allen, Esq.
14
15  ON BEHALF OF DEFENDANT SENSIENT FLAVORS LLC:
16      Michael Best & Friedrich LLP
        100 East Wisconsin Avenue, Ste. 3300
17      Milwaukee, WI 53202-4108
        By Paul E. Benson, Esq.
18
19
20
21
22
23
24
```

```
 1                    I N D E X
 2   Examination By                              Page
 3   Mr. Kawala - Cross                             5
     Mr. Allen - Cross                            218
 4   Mr. Benson - Cross                           271
     Mr. Allen - Further Cross                    307
 5   Mr. Benson - Further Cross                   313
 6
     Exhibits                                    Page
 7
     Exhibit 1 - CD of Medical Records             12
 8
     Exhibit 2 - CD of Medical Records             13
 9
     Exhibit 3 - CD of Medical Records             13
10
     Exhibit 4 - Pulmonary Function Test 07-21-11  15
11
     Exhibit 5 - Cleveland Clinic STAR Imaging     15
12              Final Report, 07-21-11
13   Exhibit 6 - Blood Test Results, 07-25-11      16
14   Exhibit 7 - Handwritten Notes                 63
15   Exhibit 8 - Independent Medical Evaluation,   89
                 07-21-11
16
     Exhibit 9 - Physical Exam Sheet              144
17
     Exhibit 10 - New Pulmonary Patient           151
18               Questionnaire
19   Exhibit 11 - Amended Notice of Deposition    218
20   Exhibit 12 - Curriculum Vitae                221
21   Exhibit 13 - Deposition and Trial Testimony  273
                  History
22
23   (Exhibits 2, 7, 11, 12, 13 returned to Charles A.
     Pue, M.D.  Exhibits 1, 3, 4, 5, 6, 8, 9, 10 returned
24   to the Sleep and Breathing Research Institute.
```

```
 1               Friday Morning Session
 2             September 13, 2013, 9:00 a.m.
 3                       - - - - -
 4                   S T I P U L A T I O N S
 5                       - - - - -
 6        It is stipulated by counsel in attendance that
 7   the deposition of Charles A. Pue, M.D., a witness
 8   herein, called by the Defendants for
 9   cross-examination, may be taken at this time by
10   the notary pursuant to notice that said deposition
11   may be reduced to writing in stenotypy by the
12   notary, whose notes may thereafter be transcribed
13   out of the presence of the witness; that proof of
14   the official character and qualification of the
15   notary is waived; that the signature of the
16   witness to the transcript of said deposition is
17   expressly waived by counsel and the witness; said
18   deposition to have the same force and effect as
19   though signed by the said Charles A. Pue, M.D.
20                       - - - - -
```

```
 1        CHARLES A. PUE, M.D.
 2   being first duly sworn, testifies and says as
 3   follows:
 4            CROSS-EXAMINATION
 5   BY MR. KAWALA:
 6   Q.   Would you please state your full name?
 7   A.   Charles A. Pue, M.D.
 8   Q.   Dr. Pue, my name is Dave Kawala. We've
 9   met before. I represent one of the defendants in
10   a lawsuit filed by David Stults. I want to ask
11   you about opinions you might hold regarding
12   Mr. Stults today. Okay?
13   A.   Yes.
14   Q.   You generally know the ground rules of
15   a deposition. Do you need me to go over them?
16   A.   No.
17   Q.   Okay. If I ask you a question that is
18   unclear or doesn't make sense to you, please don't
19   answer it. Please ask me to clarify.
20   A.   I will do that, yes.
21   Q.   You prepared a report of July 27th,
22   2011?
23   A.   That's correct.
24   Q.   Have you done anything to update or
```


### Page 86

1 breath persisted.
2     And he really went on very extensively
3 about this because he was under the feeling that
4 this had been mischaracterized in the past for
5 him. He indicated to me that his a-fib was
6 episodic and he had his baseline severe shortness
7 of breath. When he would get the a-fib, he would
8 then become even more impaired. And then when he
9 was brought out of the a-fib, he was back to his
10 baseline impairment. And he felt that because he
11 said, yeah, it feels so much better, that people
12 interpreted that to mean that he felt good. But
13 he was very clear, and he wanted me to understand,
14 he did not feel good. He just didn't feel as bad
15 as when he had the a-fib.
16 Q.   You realize from reviewing the records
17 that Mr. Stults' a-fib and PVC, his cardiac
18 condition, pre-dated his lung condition, correct?
19 A.   That's correct. I had it in the
20 records as going back as -- possibly as far back
21 as the '80s.
22 Q.   Right. And I take it, it would be your
23 understanding, if not your opinion, that
24 Mr. Stults' cardiac condition is unrelated to his

### Page 87

1 lung condition?
2 A.   That is correct.
3 Q.   And so when Mr. Stults had the onset of
4 his lung symptomatology in either late 2008 or
5 early 2009, he already had this cardiac condition
6 present?
7 A.   That's my understanding, yes.
8 Q.   And did you review the records of
9 Mr. Stults' care through Spectrum that indicated
10 that when he would have episodic a-fib and PVCs,
11 that it would result in fatigue and shortness of
12 breath?
13 A.   Yes. And what he indicated to me was
14 that it was worsening of the fatigue and shortness
15 of breath, not development of fatigue and
16 shortness of breath. His symptoms that he had
17 became worse when the a-fib occurred.
18 Q.   But the a-fib and the PVCs pre-dated
19 the lung disease.
20 A.   That's true. He had fatigue and a-fib
21 -- fatigue when he had a-fib. But after he
22 developed the lung disease, he had a baseline
23 shortness of breath all the time and a baseline
24 fatigue that, when he was in a-fib, was even

### Page 88

1 worse.
2 Q.   Did Mr. Stults deny to you that he told
3 Dr. Schmitt that he felt a night-and-day
4 difference in his energy level after ablation?
5 A.   He indicated that he said that. But
6 again, he indicated to me that he felt that that
7 was misinterpreted meaning that he felt good, but
8 he did not feel good by what he told me. He said
9 he felt better because his heart was back in
10 rhythm and the palpitations were gone. He could
11 feel that immediately. But it was going from
12 really bad to bad. Not bad to good.
13 Q.   Okay. If you'd go ahead with the note,
14 please. Thank you.
15 A.   Okay. He indicated that he had started
16 with a new pulmonologist; that his old
17 pulmonologist had retired sometime in 2011. There
18 was a trial of a course of Rituxan, but he
19 indicated to me that the rheumatologist did not
20 feel that he had lung disease from RA and
21 therefore, no further Rituxan was given. He
22 indicated that -- he then went on to describe some
23 other things to me.
24     He said after I had seen him in 2011,

### Page 89

1 he had talked more with his wife, and they had
2 gone more through their history of when he was
3 exposed to microwave popcorn. And he indicated
4 that they started eating microwave popcorn when
5 they were dating in 1987 into 1988. And he
6 indicated to me that he had spoken to people that
7 he used to work with at Quest Diagnostics, and
8 that they remembered him eating microwave popcorn
9 pretty regularly. And he told me that he worked
10 there, I think in 1990.
11     He stated that they continued the two
12 bags a day until 2007, which I believe in my
13 report -- do you still have my report?
14 Q.   Yes, your report --
15 A.   No, I have it back.
16 Q.   In your report it says 2004.
17 A.   I have 2004. He indicated --
18     MR. ALLEN: I'm sorry, did we mark
19 that?
20     MR. KAWALA: No, I didn't. Let's mark
21 your report as Exhibit 8, Doctor.
22     - - - - -
23     Thereupon, Exhibit 8 is marked for
24 purposes of identification.

## Page 90

THE WITNESS: All right. Yes, in my original report he had told me from 1991 to 2004, and so when I was talking with him on the phone, he said his wife had indicated they started in '87 or '88, somewhere in that range when they started dating.

And then on page 2, he said they continued two bags a day until 2007. His wife and he had decided that from 2007 until May of 2010, they had decreased to one bag per day. And the reason he remembered May of 2010 is the date was that's when they moved.

BY MR. KAWALA:

Q. Okay. Let me interrupt you here because this is all new and interesting.

MR. ALLEN: But not surprising.

Q. You took a history from Mr. Stults when he came to see you in 2011?

A. That's correct.

Q. And why did you take a history?

A. Why do I take a history?

Q. Yes.

A. That's how I obtain information from

## Page 91

people.

Q. And why do you take a history in a case of someone like Mr. Stults to find out about microwave popcorn consumption?

A. Because he had potentially microwave popcorn-related lung disease. So that was important in the history. Also asking him about other exposures, chemicals, jobs, all kinds of things.

Q. And you assume that the history Mr. Stults is giving you is complete and accurate, correct?

A. That's all that I can go by is what people provide to me.

Q. Correct.

A. Correct.

Q. And so if Mr. Stults had had a history of chemical exposures or worked around chemicals or things like that, you're expecting that he's going to give you that information?

A. I expect that people will give me what they're aware, what they remember. Stories change at times.

Q. Stories change, which means that then

## Page 92

somebody is giving you two different stories?

A. Stories evolve, yes. People remember things. They get other information. You know, trying to ask somebody a specific question from 10, 15 years ago, sometimes they're off.

Q. Sometimes histories are inaccurate?

A. Sometimes they are.

Q. Sometimes memories change?

A. Sometimes they do.

Q. Did you believe that the history that Mr. Stults gave you in 2011, that he had consumed microwave popcorn from 1991 to 2004 at a two-bag-per-day rate was an accurate history?

A. That was as accurate a history as I could obtain from him at that time, yes.

Q. Did Mr. Stults, when he gave you that history, indicate that he was uncertain of that history or thought that the -- that he needed to do more research or do more investigation to come up with an accurate history?

A. He didn't say anything to me at that time about that, no.

Q. So when you wrote your independent medical evaluation in July of 2011, you believed

## Page 93

that the history that Mr. Stults gave you was complete and accurate?

A. Yes.

Q. And you based your opinions on that?

A. Yes.

Q. Do you have any independent verification that Mr. Stults consumed microwave popcorn from 1991 to 2004 besides what he told you?

A. No, I do not.

Q. Have you spoke to anyone else, person to person, that has told you they saw Mr. Stults eat microwave popcorn at any time?

A. No, I have not.

Q. Have you seen any contemporaneous records between 1991 and 2004 that indicate Mr. Stults told anyone or it was noted that Mr. Stults consumed popcorn at this rate?

A. I have no independent information for that.

Q. Would it be correct to say, Dr. Pue, that the only information you have that Mr. Stults consumed microwave popcorn at all is from Mr. Stults?

Min-U-Script®     Realtime - Videoconferencing - Trial Presentation - Video     (23) Pages 90 - 93
Spectrum Reporting LLC
Case 5:11-cv-04077-MWB    Document 247-3    Filed 12/10/13    Page 4 of 20

Page 94

1  A.      That is correct.
2  Q.      And if I understand what you're telling
3  me is earlier this week you called Mr. Stults and
4  he gave you a different history as to his
5  consumption of microwave popcorn, correct?
6  A.      That is correct.
7  Q.      He changed the date in which he started
8  his consumption of popcorn from 1991 to 1987?
9  A.      Correct. He said '87 or '88. I want
10 to be clear on that. I remember him saying that.
11 Q.      All right.
12 A.      Because that was when he started dating
13 his wife.
14 Q.      Okay. Do you believe that Mr. Stults
15 recalled when he was dating his wife when he saw
16 you back in July of 2011?
17 A.      Say that one more time.
18 Q.      Do you believe that when Mr. Stults
19 visited you in July of 2007, he knew when he
20 started to date his wife?
21 A.      I'm assuming he knew that, but I can't
22 guess that.
23 Q.      All right. Mr. Stults, in his initial
24 evaluation, told you that he started this habit of

Page 95

1  consuming popcorn every night with his wife
2  because that was the year his daughter was born.
3  A.      That's what he had indicated to me at
4  that time, yes.
5  Q.      And that was obviously a landmark event
6  in his life and one that he could correlate that
7  activity to her birth?
8  A.      That's what he indicated to me, yes.
9  Q.      So when he gave you his statement or
10 his history at the time of his evaluation, he
11 keyed it to the birth of his daughter?
12 A.      That's what he told me, yes.
13 Q.      When you spoke to him a few days ago,
14 he keyed the beginning of his consumption of
15 microwave popcorn to when he began dating his
16 wife?
17 A.      That's correct. That's what he told
18 me.
19 Q.      Did you ask Mr. Stults why his history
20 changed?
21 A.      Well, as I stated earlier, he states
22 that after he had seen me, he had talked more with
23 his wife and they had gone back and thought more
24 about it. I don't think they were doing two bags

Page 96

1  a day. What he indicated to me, they were doing
2  two bags a night after the baby was born. The
3  information he gave me the other day was that they
4  had started eating microwave popcorn when they
5  started dating, but I don't think it was to the
6  degree that it was in 1991.
7  Q.      How much microwave popcorn did
8  Mr. Stults tell you he was consuming between '88
9  and -- '87/'88 and 1991?
10 A.      At that point he indicated it was just
11 more occasional in the beginning. It wasn't an
12 every day event in '87/'88. And they gradually
13 increased. And then in 2001 was when they had the
14 ritual of every night popping popcorn and watching
15 movies after they put the baby to bed.
16 Q.      Did you ask Mr. Stults whether he
17 actually had an independent recollection of
18 consuming microwave popcorn between '87 and '91 or
19 if that's just what his wife told him?
20 A.      I'm trying to remember the exact words
21 he used. I think he said, my wife reminded me
22 that we had been eating popcorn when we started
23 dating before we had the baby. So that was the
24 term he used, his wife had reminded him. He had

Page 97

1  forgotten about that.
2  Q.      So it was your understanding that his
3  wife just -- did he tell you when his wife
4  reminded him of that?
5  A.      No. I didn't ask him that.
6  Q.      Are you aware that Mr. Stults gave
7  sworn deposition testimony in this case?
8  A.      I haven't read his deposition.
9  Q.      But --
10 A.      I wasn't aware that --
11 Q.      -- I guess you could surmise we took
12 his dep.
13 A.      Yeah.
14 Q.      Do you have any knowledge of what
15 history Mr. Stults gave in that deposition?
16 A.      No.
17 Q.      So as you understood Mr. Stults' recent
18 communication with you last Tuesday, he told you
19 his wife reminded him that he ate microwave
20 popcorn from '87/'88 to '91?
21 A.      Correct. Basically he indicated to me
22 that it wasn't like they were never eating popcorn
23 before and then suddenly they started eating two
24 bags a night in 1991. They had -- they were

Page 98

1  eating microwave popcorn together from when they
2  got together.
3  Q.    Okay. And that would indicate to you
4  that the original history that Mr. Stults gave in
5  July of 1991 was inaccurate?
6  A.    You might use the word "inaccurate."
7  I'd say "incomplete."
8  Q.    Did it concern you that now, more than
9  two years after your initial evaluation, that the
10 history of microwave popcorn consumption was
11 changing in this case?
12       MR. HALL: Object to the form.
13 A.    I don't draw any judgment on it. I was
14 talking to him. I asked him -- he just gave me
15 information. I documented what was given to me.
16 Q.    Did Mr. Stults ask his wife whether or
17 not he had had any history of chemical exposures
18 that he couldn't remember that she could?
19 A.    I can't speculate on what he asked his
20 wife.
21 Q.    Mrs. Stults is a plaintiff in this
22 lawsuit. You're aware of that?
23 A.    I didn't know that specifically.
24 Usually that is the case.

Page 99

1  Q.    Okay. Besides the two people that are
2  plaintiffs in this lawsuit, Mr. Stults and his
3  wife, do you know of anybody who can corroborate
4  any of the claims that Mr. and now Mrs. Stults are
5  making to you about his consumption of microwave
6  popcorn?
7  A.    I took the history. I don't have any
8  independent information with regard to that.
9  Q.    Was Mrs. Stults with David when he came
10 to see you for the exam?
11 A.    Typically if a spouse is present, I
12 will comment on that. And I did not comment that
13 she was present for the evaluation.
14 Q.    Did you have any concern of doing the
15 physical examination of David Stults, that he was
16 going to be fatigued or tired because he had
17 traveled to see you?
18 A.    No.
19 Q.    Okay. Let's talk about the -- the
20 other -- the other side of the equation.
21       Mr. Stults told you when he gave you
22 the history in July of 2011 that his -- strike
23 that.
24       Mr. Stults told you in July of 2011

Page 100

1  about a history of consuming microwave popcorn
2  that went up to and through 2004, correct?
3  A.    Correct.
4  Q.    If Mr. Stults' consumption of microwave
5  popcorn had ended in 2004, as he told you in July
6  of 2011, would you expect that the onset of
7  symptoms and signs of lung disease would have
8  occurred within three years thereafter?
9  A.    I mean, I don't know that we know
10 enough about the disease to say what the latency
11 period is completely. I mean, most patients
12 present within a shorter period of time than the
13 time frame you just presented. But I don't know
14 that we can't say that someone could have a more
15 latent -- more latency than that.
16 Q.    Most -- most patients that you've seen
17 actually are still consuming microwave popcorn at
18 the time that their signs and symptoms onset. Is
19 that true?
20 A.    That is true.
21 Q.    Okay. Are you aware of any medical
22 literature where it suggests that somebody can end
23 their consumption of microwave popcorn and have no
24 symptoms for almost five years?

Page 101

1        MR. HALL: Object to the form. Assumes
2  he had no symptoms.
3        But go ahead.
4  Q.    Okay. Well, let's clear that one up.
5        Based upon your review of the medical
6  records, did you see any signs -- signs, symptoms
7  or complaints by Mr. Stults that you would relate
8  to his exposure to diacetyl before -- before late
9  2008?
10 A.    I did not.
11 Q.    So if Mr. Stults ended his microwave
12 popcorn consumption in 2004 and had no signs and
13 symptoms -- or symptoms of lung damage until late
14 2008, would that fact argue against the cause of
15 his lung disease being diacetyl?
16 A.    No, it would not because when he
17 presented, his first lung functions were 50
18 percent, if I remember correctly. They were
19 severely impaired. That doesn't just happen
20 overnight. His FEV1, I think, was 45 percent or
21 something like that.
22 Q.    I believe it was 51.
23 A.    So 51 percent. So that's not something
24 that happens in just a few months or a year.

1  That's something that progresses over several
2  years. Five to seven years it could be.
3  Q.    But it was measured three -- three
4  months later in June, correct?
5  A.    Correct.
6  Q.    And it had fallen 18 percent?
7  A.    Correct.
8  Q.    Fallen to 31 or 32 percent.
9  A.    Right.
10 Q.    So there's an 18 percent drop in three
11 months.
12 A.    Um-hmm.
13 Q.    So --
14 A.    And it was a little better a few months
15 later. I mean, he was in that period. I don't
16 know what his curve was.
17 Q.    Are you aware of any medical literature
18 that supports the fact that someone who has not
19 been exposed to diacetyl for a period of over four
20 years would first, thereafter, have signs or
21 symptoms of lung damage four plus years later?
22       Have you ever seen that?
23 A.    I have not seen that published yet.
24 Q.    And have you ever seen a patient you

Page 103

1  can tell me of who came to see you and said the
2  last time I was exposed to diacetyl in microwave
3  popcorn was more than four years -- strike that.
4        Are you aware of any patient who had
5  more than a four-year gap between their last
6  exposure to diacetyl and first onset of signs,
7  symptoms or complaints of lung damage related to
8  that exposure?
9  A.    Not that I recall.
10 Q.    So would you agree with me that based
11 upon the published literature and all of your
12 experience in seeing probably over what, 200
13 patients?
14 A.    Approaching.
15 Q.    You have never seen anybody with a
16 four-year gap of their last exposure and the first
17 onset of their symptomatology?
18 A.    I'm trying to remember time frames on
19 all the patients. I don't know if that's 100
20 percent accurate.
21 Q.    Then tell me about the patient that had
22 a four-year gap.
23 A.    Give me a minute.
24       I think I will go back to my previous

Page 104

1  statement is that I can't specifically identify
2  anyone that has that more-than-four-year gap as
3  you're asking.
4  Q.    Did it concern you, when you wrote your
5  report in 2011, that Mr. Stults gave you a history
6  that he was last exposed in 2004, but didn't have
7  any symptoms until the fall of 2008. Was that
8  something that concerned you?
9  A.    No, because my concern with him was
10 that he was so severely impaired when he
11 presented, he -- he strikes me as a -- he was so
12 fit leading up -- this guy was a very, very active
13 guy for so many years, that a lot of people
14 compensate for long periods of time and can find
15 ways around dealing with their shortness of breath
16 and their decreasing performance status until they
17 get down to 50 percent lung function.
18       So this could have been evolving for
19 several years.
20 Q.    And in this particular case, do you
21 have any PFT results on Mr. Stults before March of
22 2009?
23 A.    I do not.
24 Q.    And do you have any expert opinions as

Page 105

1  to when Mr. Stults first began to lose lung
2  function due to his exposure to diacetyl?
3  A.    I can't give you the exact date that
4  that occurred.
5  Q.    Can you give me a year?
6  A.    It had to have been going on for
7  several years.
8  Q.    And why do you say it had to have been
9  going on for several years?
10 A.    His degree of pulmonary impairment, in
11 my opinion, far exceeds what would have happened
12 in just a year or two.
13 Q.    Would it have exceeded what would have
14 happened in three years?
15 A.    It's starting to get up into three-,
16 four-, five-year range.
17 Q.    Can you point to me a single -- a
18 single patient -- strike that.
19       I think we have already established you
20 can't bring to mind a single patient that had a
21 four-year gap between their last exposure and the
22 onset of symptoms.
23 A.    My gut tells me there's been some, but
24 I can't come up with a specific patient, so I have

Page 110

1  A.  That was what he indicated to me, yes.
2  Q.  So as far as the patient's history
3  goes, history of symptoms, there were none until
4  late 2008?
5  A.  That's what he indicated to me, yes.
6  Q.  Okay. Let's talk about the other side
7  of the equation, which is the history of
8  consumption after 2004.
9      Mr. Stults indicated to you that he
10 continued eating two bags a day through 2007 in
11 your recent phone conversation?
12 A.  That's what he told me, yes.
13 Q.  And what was Mr. Stults' source of that
14 information that he -- that he consumed two bags a
15 day from '04 to '07?
16 A.  Again, he indicated that after
17 discussing it more with his wife, that's what they
18 determined was the accurate estimate.
19 Q.  Did he indicate that that's what he
20 determined, that's what she determined or that
21 this was a joint venture?
22 A.  I don't know specifically.
23 Q.  Did Mr. Stults tell you that he had
24 gone on the internet and done a search of various

Page 111

1  microwave popcorn websites with his wife?
2  A.  I don't remember that, no.
3  Q.  Did you ask Mr. Stults why he had
4  failed to tell you of this history of consuming
5  microwave popcorn at two bags a day from '04 to
6  '07 when you saw him in July of '11?
7  A.  He indicated to me that he just felt
8  that he had the dates wrong.
9  Q.  Any other explanation other than that?
10 A.  No. He just felt that he had
11 underestimated it.
12 Q.  Did you send Mr. Stults a copy of your
13 independent medical evaluation?
14 A.  No, I did not. I send it to the
15 attorneys. Now, if he got it from his attorney,
16 that's how he would have it. But it wouldn't be
17 from me.
18 Q.  Okay. So did he tell you he had read
19 your report?
20 A.  No.
21 Q.  So how is it, if you know, that
22 Mr. Stults was even -- even -- how did Mr. Stults
23 even recall what history he gave you?
24 A.  Ask me the question again.

Page 112

1  Q.  I'm probably leaving out a few
2  prefatory questions.
3      Mr. Stults calls you up and says, I
4  need to change the history, correct?
5  A.  No, that's not what happened. I called
6  him because I hadn't seen him in two years. And I
7  called Mr. Hall and said, can I call and talk to
8  him because it's been two years since I talked to
9  him.
10 Q.  I get that part of it. But you didn't
11 go back to Mr. Stults and say, you told me before
12 the exposure was '91 to 2004, do you want to
13 change that. You didn't say that.
14 A.  No, I didn't ask him that.
15 Q.  He volunteered to you in the course of
16 the conversation that he had additional exposure
17 after 2004.
18 A.  Correct.
19 Q.  So he volunteered to you that he
20 evidently knew or was otherwise aware that he had
21 given you a history of stopping in 2004, but he
22 wanted to indicate that history was wrong?
23 A.  That wasn't exactly what he said, but
24 that's -- that's about it, yes. He said to me, I

Page 113

1  need to correct what I told you or I need to give
2  you -- let me think of the words he used. It was
3  just a couple days ago.
4      I think he said, the more that I
5  thought about it and I talked to my wife about it,
6  I need to change what I told you before. And then
7  he told me what the exposure was, starting earlier
8  and after. So he -- from what you tell me, if he
9  had a copy of the report, then he would have seen
10 what I put in the report. But I didn't -- he
11 didn't tell me he had seen it in my report.
12 Q.  So the way he explained it to you was
13 that he had thought about it more and he had
14 talked to his wife?
15 A.  Yes.
16 Q.  Did he tell you that as he thought
17 about it more, his memory of this additional
18 exposure came to mind?
19 A.  Yes.
20 Q.  Did Mr. Stults tell you that his memory
21 seemed to be functioning pretty well?
22     MR. HALL: Object to the form.
23 A.  I'm not sure what you mean by the
24 question.

## Page 118

1  disease process.
2  Q. Okay. But all other things being equal
3  in this case, if somebody came in and told you, I
4  have the onset of signs and symptoms associated
5  with bronchiolitis obliterans within one year
6  after I was last exposed to microwave popcorn as
7  opposed to four years, a four-year gap, wouldn't
8  your suspicion that diacetyl was the cause be
9  stronger in the case of the person who had only
10  had the one-year gap versus a four-year gap?
11       MR. HALL: Same objection.
12  A. The -- as previously stated, with the
13  association, it depends on the patient, it depends
14  on the severity of disease. If you're giving me
15  patients with severe impairment, that longer
16  period of time could be very reasonable.
17  Q. It could be. But I think you told us
18  already you're not aware of any literature or any
19  patient you've ever seen that presented with a
20  four-year gap, correct?
21  A. That's correct.
22  Q. You're aware of patients that have
23  complained or have had a one-year gap between
24  their last exposure to microwave popcorn and their

## Page 119

1  onset of signs and symptoms of bronchiolitis
2  obliterans?
3  A. That's true.
4  Q. And that one-year gap is supported not
5  only by your experience, but by the literature?
6  A. Correct.
7  Q. Okay. And then Mr. Stults told you
8  that from 2007 going forward, how much did he tell
9  you he consumed?
10  A. He said they decreased to about a bag
11  per day. And I said every day? He said about
12  90 percent of the time.
13  Q. So from what period to what period,
14  please?
15  A. From '07 to May of 2010 when they
16  moved.
17  Q. Okay. So now it's keyed to the moving
18  of the house.
19  A. Correct. So the ritual of two bags
20  every night decreased in 2007 to one bag. And he
21  said it wasn't every night, but it was about 90
22  percent of the time, from '07 to May of 2010. He
23  said they moved in May of 2010 and they didn't
24  continue to regularly eat microwave popcorn after

## Page 120

1  that, although they still did use it occasionally
2  until January of 2011.
3  Q. Okay. Just so I get these numbers
4  right. From '07 to May of '10, it was one bag
5  almost every night.
6  A. That is what he told me, yes.
7  Q. Then from May of '10 to January of '11,
8  it was --
9  A. Just occasionally. He said very -- you
10  know, like -- from what he indicated to me, it was
11  not a frequent occurrence. It wasn't something
12  they did regularly in the new house. They had it
13  and they maybe had one occasionally. But it
14  wasn't something they did regularly.
15  Q. Can you -- once a week? Once a month?
16  A. The impression he gave me, it was a
17  once-a-week, once-a-month kind of thing. It
18  wasn't something they did -- definitely not
19  something they were doing every day.
20  Q. So the history that Mr. Stults -- and
21  as to the history of Mr. Stults consuming
22  microwave popcorn from May 2010 through January
23  2011, did Mr. Stults tell you that he came to that
24  memory? How he recalled that new exposure?

## Page 121

1  A. Ask me again so I make sure I get the
2  dates right on your question.
3  Q. Yes. What I'm trying to do is I'm just
4  trying to break this down, Doctor.
5       We already talked about the fact that
6  from 2004 to 2007, Mr. Stults now claims that he
7  ate two bags or was exposed to two bags daily,
8  correct?
9  A. Correct.
10  Q. Okay. From 2007, now, to May 2010, let
11  me ask you about that segment of time.
12  A. Okay.
13  Q. From May 2007 to May -- from 2007 to
14  May of 2010, Mr. Stults now claims that he had one
15  bag almost every night.
16  A. That's what he indicated to me.
17  Q. And did Mr. Stults indicate to you what
18  was the source of his knowledge or information
19  that he was consuming popcorn at an
20  almost-one-bag-a-night rate from '07 to May of
21  2010?
22  A. This was all taken as part of the same
23  history. So it goes back to the history he made
24  at the very beginning. I didn't ask about each

## Page 122

1  segment, how he defined that one.
2  Q. Okay. So it would have been two
3  components, he thought about it some more and he
4  spoke to his wife.
5  A. Correct.
6  Q. Did you ever ask to speak to his wife
7  about -- to corroborate her recollections as
8  reflected by Mr. Stults in this Tuesday
9  conversation?
10 A. No, I did not.
11 Q. Have you looked -- have you seen the
12 report of Dr. Egilman?
13 A. No, I have not.
14 Q. Have you seen the report of Dr. Parmet?
15 A. No, I have not.
16        MR. HALL: Object to the form. Asked
17 and answered on both.
18 Q. Have you seen the report of
19 Dr. Swenson?
20 A. I have not.
21 Q. Have you seen the report of
22 Mr. Ostrander?
23 A. I'm not sure who Mr. Ostrander is.
24 Q. He's a voc guy from one of the Dakotas.

## Page 123

1  A. No.
2        MR. ALLEN: Mr. Stults can't work
3  because of his memory.
4  Q. Are you aware of the fact that
5  Mr. Stults has given a different history of
6  microwave popcorn consumption to those experts
7  than you?
8  A. Well, as I stated, I haven't seen the
9  reports so I don't know what history he gave to
10 other people. The only history that I'm providing
11 to you today is the history that he gave to me
12 directly.
13 Q. Are you aware that he gave none of the
14 plaintiff's experts the same history, that he gave
15 all of them different dates?
16 A. As I just stated a moment ago, I
17 haven't seen any of the other reports and I don't
18 know what other history he gave to anybody else.
19        MR. HALL: That mischaracterizes, by
20 the way, the history, but go ahead.
21 Q. Did it concern you, Dr. Pue, that now
22 two years after you had seen Mr. Stults, he calls
23 you back -- or you call him back and he volunteers
24 additional exposure history after 2004?

## Page 124

1        MR. HALL: Object to the form. That's
2  already been asked and answered and he's given you
3  his answer. I know you want to try to get him to
4  say something different, but...
5        MR. ALLEN: Object to the speaking
6  objection.
7        MR. HALL: It would be good -- this
8  deposition would be over quicker if you'd stop
9  asking the same questions over and over.
10       MR. ALLEN: Object to the speech.
11       MR. KAWALA: This is all new exposure
12 history, Scott.
13       MR. HALL: That doesn't excuse the same
14 questions being asked over and over, okay, and
15 that's being done.
16       MR. KAWALA: I'm sorry I'm not more --
17       MR. HALL: That's been done on multiple
18 occasions. So I'm just trying to --
19       MR. KAWALA: I want to apologize to you
20 for that. I want to apologize that now that we've
21 introduced another ten years of exposure to the
22 record, that I didn't find out until halfway into
23 this deposition --
24       MR. HALL: That's not true.

## Page 125

1        MR. KAWALA: -- that I'm not better
2  prepared to address it.
3        MR. HALL: Your math is a little off.
4  That is not another ten years.
5        MR. KAWALA: Well, we've got four years
6  from '87 to '91, there's four.
7        MR. HALL: Which you knew about in the
8  deposition, so that's not new to you.
9        MR. BENSON: Then 2004 to 2010, that's
10 six, so I got an extra decade to deal with.
11       MR. HALL: Okay. That's not true.
12 But go ahead.
13 BY MR. KAWALA:
14 Q. Did Mr. Stults describe to you, when he
15 talked to you on Tuesday, an additional 10 or 11
16 years of exposure to microwave popcorn than he had
17 told you originally?
18 A. Yes.
19 Q. Four years on the backside and six or
20 seven years on the front side.
21       MR. HALL: That's not true.
22       MR. ALLEN: Now you're testifying
23 again.
24       MR. HALL: It's '87 to '91, do the

## Page 126

1   math.
2       MR. KAWALA: That's four years.
3       MR. HALL: You said six years.
4       MR. KAWALA: Six years is later, Scott,
5   '04 to '10. That's six years.
6       MR. ALLEN: I'd like the witness's
7   testimony.
8       MR. HALL: And can you stop making
9   these speeches? That's about the fifth time
10  you've made --
11      MR. ALLEN: You're testifying under
12  oath. You keep testifying and you know it's
13  inappropriate.
14      MR. HALL: You're sitting over there
15  making these nasty comments as Dr. Pue is
16  testifying and it's getting a little old. Just
17  sit over there and be quiet. You'll have a chance
18  to ask your questions --
19      MR. ALLEN: I'm just preserving the
20  record.
21      MR. HALL: -- and then you can bring
22  out his testimony however you want. But let's not
23  make these inappropriate comments.
24      MR. ALLEN: Will you stop testifying,

## Page 127

1   then?
2       MR. HALL: Go ahead, Dave.
3       MR. ALLEN: Will you stop testifying?
4       MR. HALL: Go ahead, Dave.
5       MR. ALLEN: Okay. So the answer is no.
6       MR. KAWALA: Let's keep going.
7   BY MR. KAWALA:
8   Q.  So here's my question, Doctor: Were
9   you concerned that Mr. Stults, when you spoke to
10  him just last Tuesday, what was that, three or
11  four days ago, provided you with another 10 or 11
12  years of microwave popcorn consumption history
13  that he had never provided to you before?
14      MR. HALL: Object to form. That's the
15  third or fourth time you've asked that question.
16      But go ahead.
17  A.  You asked if I was concerned.
18  Concerned requires me to be passing judgment. I
19  wasn't drawing any judgment. I just was asking --
20  I was just talking to him and this is information
21  he gave me. I'm a conduit to collect information
22  and to -- and to document it and then use that
23  information to draw conclusions. But I don't
24  judge what's being given to me.

## Page 128

1   Q.  Do you have any obligation to exercise
2   any judgment or scrutiny as to what information
3   that was given to you originally was incomplete?
4       MR. HALL: Object to the form.
5   Essentially the same question again.
6   A.  I felt when I talked to him, he gave me
7   satisfactory reasoning as to why he was giving me
8   different information.
9   Q.  The information Mr. Stults gave you
10  three or four days ago was an increase in his
11  exposure history, correct?
12  A.  That is true, yes.
13  Q.  And you would agree with me that
14  exposure to diacetyl in microwave popcorn does
15  involve a dose-duration relationship?
16  A.  There's a dose-duration relationship,
17  but there's also -- I believe it's documented
18  about the peak levels, as well.
19  Q.  Well, let me go at it this way: Would
20  you agree with me, Doctor, that there are levels
21  of exposure to microwave popcorn, diacetyl in
22  microwave popcorn, by inhalation that do not
23  result in any lung injury or damage?
24  A.  I don't know that anyone has defined

## Page 129

1   the exact safe levels of diacetyl inhalation.
2   Q.  But there are safe levels, correct?
3   A.  I don't know what they are.
4   Q.  If I told you Mr. Stults had consumed
5   one bag of microwave popcorn and had been exposed
6   to diacetyl fumes and then later you found out he
7   had lung damage, namely BO, would you attribute
8   that cause to one bag of exposure?
9   A.  I wouldn't -- likely not, no.
10  Q.  Because that would be within the
11  threshold or under the level at which common sense
12  and medical literature would indicate no injury
13  occurs?
14      MR. HALL: Object to the form. He
15  already stated there is no safe level. Now you're
16  trying to get him to state there is.
17  A.  I'm not even sure what the question was
18  now.
19  Q.  Okay. Let me try to rephrase it.
20      MR. ALLEN: You were interrupted by
21  that speaking objection. Try it again.
22      MR. HALL: I'm sick of the
23  mischaracterizations.
24      But go ahead.

Case 5:11-cv-04077-MWB   Document 247-3   Filed 12/10/13   Page 11 of 20

1  Q.    Dr. Pue, if somebody had one bag of
2  exposure to microwave popcorn containing diacetyl
3  and had inhaled those fumes, are you of the
4  opinion that that exposure could result in
5  bronchiolitis obliterans?
6         MR. HALL: Objection. Asked and
7  answered.
8  A.    It's probably unlikely. I can't say
9  it's zero because I don't know what the safe
10 threshold is for anybody.
11 Q.    Millions of people have consumed
12 microwave popcorn over the decades?
13 A.    I don't know the statistic on it, but I
14 -- that's probably a fair estimate.
15 Q.    Besides Mr. Newkirk, Ms. Daughetee and
16 Mr. Stults, do you know anyone else who claims
17 injury from inhalation of diacetyl and microwave
18 popcorn as a plaintiff in litigation? As a
19 consumer, I should say.
20 A.    Those are the ones that I'm aware of.
21 Q.    Okay. With regard to Mr. Newkirk, do
22 you recall he had an over-ten-year history of
23 exposure to microwave popcorn?
24 A.    I don't remember the specifics of that

1  case now.
2  Q.    Okay. He was exposed to a lot more
3  than one bag?
4  A.    Yes.
5  Q.    Same for Ms. Daughetee, she had a
6  multiple-year exposure to microwave popcorn?
7  A.    She had many years.
8  Q.    And she had a lot more exposure than
9  one bag?
10 A.    Yes.
11 Q.    How do you know that the updated
12 estimates given to you by Mr. Stults just this
13 last Tuesday are accurate?
14 A.    You say how do I know that they're
15 accurate? That's the question? I'm just
16 providing the information that's given to me. I
17 can't judge the accuracy one way or the other.
18        When I was talking to him he provided
19 me the information. He explained why it was
20 different and he seemed genuine as he was talking
21 to me. But that's all I can judge it on. That's
22 why I try not to draw judgments on it.
23 Q.    So it would be fair to say you don't
24 know whether the newly provided information is

1  accurate or not?
2  A.    I have no independent confirmation of
3  its accuracy versus the other information I
4  obtained.
5  Q.    So your answer is no, you don't know?
6  A.    I have no independent confirmation of
7  it. I only have -- this is subjective information
8  that's provided to me by the patient and I
9  obtained the history and I document it.
10 Q.    Did Mr. Stults change any other
11 historical facts when he called you up and told
12 you anything else that had occurred in years
13 previous to July of 2011 when you saw him?
14        Did he tell you anything else was
15 different?
16 A.    The Prednisone history was slightly
17 different than what he had told me when I saw him
18 then. Not terribly different, but slightly
19 different.
20 Q.    And I'm sorry, a poorly formed
21 question.
22        Did Mr. Stults tell you in this
23 conversation of September 2013 that anything else
24 that he told you in the July 2011 visit was wrong

1  besides his omitted history of popcorn
2  consumption?
3  A.    Not that I recall, no.
4  Q.    So everything else you put in your
5  report that you got from him, from history, stayed
6  the same, he didn't amend or correct or add to any
7  of that, did he?
8  A.    That's correct.
9  Q.    The only thing that he changed was his
10 history of microwave popcorn consumption, which
11 went up?
12 A.    That's correct.
13 Q.    Have you been provided any information
14 as to what specific types of microwave popcorn
15 Mr. Stults consumed?
16 A.    No.
17 Q.    Do you know what brands of popcorn he
18 consumed?
19 A.    I do not.
20 Q.    Do you know -- do you know how much
21 diacetyl was contained in any of the butter
22 flavors contained in the popcorn that Mr. Stults
23 consumed?
24 A.    I do not.

1  Q.    Do you know how much diacetyl was
2  emitted from any of the brands of microwave
3  popcorn that Mr. Stults was exposed?
4  A.    I do not.
5  Q.    Have you put together any type of
6  exposure history that attempts to quantify how
7  much diacetyl Mr. Stults was exposed to?
8  A.    I did not.
9  Q.    In the context of a consumer, have you
10 done any study or analysis as to how much diacetyl
11 a consumer needs to be exposed to in order to have
12 an increased risk of BO?
13 A.    I don't know what that value is.
14 Q.    Do you have any independent way to know
15 that Mr. Stults has been exposed to enough
16 diacetyl, based on the quantity of diacetyl he was
17 exposed to, to have BO?
18 A.    I don't know the independent measures
19 of that. If I answered that question correctly.
20 Q.    Okay. So I take it none of the
21 opinions you're going to offer today are -- strike
22 that.
23        Is it correct that none of the opinions
24 that you're offering in this case are based on any

1  attempt to quantify Mr. Stults' exposure to
2  diacetyl?
3  A.    That's correct.
4  Q.    Okay. And by the way, do you know how
5  much diacetyl was contained in any of the popcorn
6  product that my client, Symrise, was involved in
7  the -- in providing the butter flavor for?
8  A.    I do not.
9  Q.    Doctor, do you know how much diacetyl
10 was contained in the butter flavor supplied by
11 defendant Sensient to any of the companies that
12 provided microwave popcorn that Mr. Stults
13 consumed?
14 A.    I do not.
15 Q.    And the same question as to defendant
16 IFF. Do you know how much diacetyl was contained
17 in the butter flavor that IFF provided to any of
18 the companies that sold microwave popcorn to
19 Mr. Stults, which he consumed?
20 A.    I do not.
21        MR. ALLEN: Could you ask for BBA,
22 Givaudan and --
23        MR. KAWALA: I'll ask it as a group
24 question because I think I'm safe I know the

1  answer.
2         MR. HALL: You can ask it as a general
3  question, if you want.
4         MR. KAWALA: I will. I will do it that
5  way, thank you. I should have done that before.
6  I'll wait for the objection.
7         MR. HALL: I'm probably not going to
8  object.
9  BY MR. KAWALA:
10 Q.    Dr. Pue, as to any -- any company that
11 provided butter flavor for the microwave popcorn
12 that Mr. Stults consumed, including Sensient,
13 Symrise, IFF, BBA, Givaudan and anybody else I
14 forgot, do you know how much diacetyl was
15 contained in that butter flavor?
16 A.    I do not.
17        MR. HALL: See, I didn't object.
18        THE WITNESS: Good suggestion.
19        MR. ALLEN: Sometimes.
20        THE WITNESS: Are you approaching a
21 breaking point?
22        MR. KAWALA: Yes, we'll take a break.
23        (A short recess is taken.)
24 BY MR. KAWALA:

1  Q.    Back on the record, Dr. Pue.
2         We were talking about the additional
3  exposure history and I just want to get a little
4  bit more explanation from you of some of the other
5  entries that you made in your notes.
6         You said co-workers from that time also
7  remember eating it regularly.
8  A.    I was writing that down as he was
9  telling it to me. And I said to him, what time?
10 1987? I remember him saying, no, I think it was
11 -- he went to Quest in 2000 I think. '99 or
12 2000 -- I'm sorry, '89 or '90. I apologize. I
13 made a mistake there. It wasn't '87, because
14 initially when he said it, I thought he meant in
15 '87 that his friends said he was eating it. But I
16 said so you -- so when were you at Quest? He said
17 I think it was '90. It was a couple years later.
18 Q.    Okay. Did -- it looks like you wrote
19 Quest Diagnostics down there later.
20 A.    He wrote -- that's my handwriting. I
21 mean, it was at the bottom of the page and I was
22 trying to squeeze it in. But that's what he told
23 me, where he worked. I was jotting notes quickly
24 while we were talking.

1 Q. So did Mr. Stults tell you that he
2 talked to people from Quest Diagnostics in the
3 recent past who told him that they remember seeing
4 him eat microwave popcorn at Quest?
5 A. That's what he said, yes. He said
6 since -- because he was telling me that he
7 remembered that it went back further than '91. He
8 said his wife said about -- reminded him about
9 when they started dating. He said also co-workers
10 had told him from that time they also remembered
11 him eating it regularly. And I said '98 -- '87 --
12 I'm sorry, I'm getting my decades confused -- '87?
13 He said, I think I started Quest in like '89 or
14 '90, if I remember correctly what he said.
15 Q. Did Mr. Stults tell you who these --
16 who these co-workers were? Did he give you names?
17 A. I didn't ask for names.
18 Q. Did he tell you that he called up these
19 people and asked them, questioned them about
20 whether or not they remembered him eating
21 microwave popcorn back in that '87 to '91 period?
22 A. He didn't tell me how the interaction
23 occurred with his co-workers. He just made the
24 statement.

1 Q. Okay. Did he suggest to you that he
2 independently recalled eating microwave popcorn at
3 the time he worked at Quest or just that other
4 people told him that he did?
5 A. I don't remember.
6 Q. Okay. Then going to page 2 of the
7 notes, continued two bags per day, 2007.
8   We talked about that already, correct?
9 A. Correct.
10 Q. From 2007, 5/10. Tell me what your
11 nomenclature means there.
12 A. Until May of 2010.
13 Q. Okay. Then about one per day. 90
14 percent of the days had a bag. Moved houses in
15 May of 2010.
16 A. That's what he told me.
17 Q. Then he suggested to you that after May
18 of 2010, didn't continue?
19 A. He said when they moved into the new
20 house, they just had different habits and such and
21 he -- they had some microwave popcorn and they
22 might have popped it occasionally, but it wasn't
23 something that was a regular occurrence in their
24 household anymore once they moved to the new

1 house.
2 Q. So -- so when is the last time
3 Mr. Stults told you he has ever consumed a bag of
4 microwave popcorn?
5 A. Well, what he told me was in January
6 2011, he was searching on the internet to find --
7 to look at causes of bronchiolitis obliterans and
8 he came across microwave popcorn butter flavor and
9 at that time he stopped using it altogether. He
10 states that was the first time he became aware
11 that it was -- there was an association there.
12 Q. And in fact, he saw you six months
13 later, correct?
14 A. Six or seven months, yeah.
15 Q. So as you understand the chronology, he
16 last ate microwave popcorn in January of 2011?
17 A. That's what he told me, yes.
18 Q. And then he sees you about six months
19 later in July of 2011?
20 A. Correct.
21 Q. And you ask him about his exposure to
22 microwave popcorn and he tells you exposure
23 through 2004, but doesn't recall exposure past
24 '04?

1 A. What he reported to me was that he was
2 eating it regularly, two bags every night, from
3 '91 to '94 --
4   MR. BENSON: I'm sorry, did you say,
5 Dr. Pue, '94 or did you mean 2004?
6 A. I'm sorry, '91 to 2004. Thank you.
7 Q. Okay.
8 A. Let me just finish reading here.
9   He didn't indicate to me, and I
10 apparently didn't ask him, did he stop it
11 completely in 2004 or, you know -- all I have in
12 the note is that's what he told me when he was
13 eating it regularly was from '91 to 2004, two bags
14 a night.
15 Q. Well, when you asked Mr. Stults about
16 his consumption history, did you say tell me how
17 -- tell me for what period of time you ate two
18 bags a night or did you say tell me about your
19 consumption history?
20 A. I said tell me about your history with
21 microwave popcorn.
22 Q. Okay. So you would have given him the
23 opportunity to provide a full history to you?
24 A. I offered it as an open-ended question.

### Page 142

1  Q.    Right. When Mr. Stults called you
2  back, he didn't say you didn't ask me about this.
3  He just said I remember more?
4  A.    Correct.
5  Q.    Okay. Found bags from 2007 and '06
6  when he moved in in 2010. They were in back of
7  pantry.
8         What's the significance of that,
9  please?
10 A.    He was indicating that initially he had
11 stated -- the reason he knew 2007 was when they
12 stopped eating it as regularly as they had or cut
13 down was because when they moved, they found bags
14 that were from 2006, the purchase dates on it.
15 And that was how he had surmised that that's when
16 they were still eating popcorn regularly. It was
17 in -- because they had used up the stuff that they
18 had had. And then when he looked in there, there
19 was still stuff from 2006 and 2007.
20        MR. ALLEN: Did you say they were
21 purchase dates?
22 A.    He said there were dates on them. So I
23 don't know what the date represented, but that was
24 dates that were on the bags.

### Page 143

1  Q.    Okay. When he -- when he had talked
2  about the 2007 date being the date that he
3  continued to eat two bags a day, I thought you
4  told me he keyed that to an event.
5  A.    Well, the two bags a day he had told me
6  -- initially he had told me, the first time I
7  talked to him, that it was in 2004. He said it
8  just stopped being a regular occurrence because
9  his kids got older. But then when I talked to him
10 the other day, he said 2007 was that date, not
11 2004.
12 Q.    But did he tell you what event occurred
13 in 2007 that jogged his memory that he ate two
14 bags a day from '04 to '07?
15 A.    Just indicating that after talking with
16 his wife, that's the -- that was the date that he
17 stated was the correct date.
18 Q.    Did Mr. Stults tell you that he kept
19 any of the bags of microwave popcorn that he
20 recovered from his pantry?
21 A.    He didn't say that he did. I didn't
22 ask him.
23 Q.    Did he tell you anything more about the
24 bags of popcorn, except that they appeared to have

### Page 144

1  been dated '06/'07?
2  A.    No. That's all he told me.
3         MR. KAWALA: Okay. The rest of the
4  history I can read pretty straightforward.
5         THE WITNESS: Okay. I just got a page
6  that I need to answer, can I have one minute?
7         MR. KAWALA: Oh, yes. Please.
8         THE WITNESS: Thank you.
9         (A discussion is held off the record.)
10        - - - - -
11        Thereupon, Exhibit 9 is marked for
12 purposes of identification.
13        - - - - -
14 BY MR. KAWALA:
15 Q.    Back on the record, Dr. Pue.
16        It looks like we have a two-page
17 document. Maybe you could explain to us what it
18 is, please.
19 A.    This is the check-in sheet and physical
20 exam sheet for when patients come in for an
21 evaluation. The front is -- the top part is
22 filled out by the medical assistant who does the
23 vital signs. And then if it's a follow-up visit,
24 there's questions that we ask. But this was a

### Page 145

1  first visit, so most of the questions are skipped.
2         MR. ALLEN: Is this Exhibit 9?
3  A.    Exhibit 9. And on the back side is my
4  notes that I take while I'm doing the physical
5  exam that I'm supposed to use when I do my
6  dictation. Apparently I skipped that that day
7  when I was doing my dictation.
8  Q.    Okay. In summary form, can you tell us
9  what the remarkable findings were? You don't have
10 to tell us the normal findings.
11 A.    He had mild obesity. Mild erythema of
12 the nasal mucosa. Mild neck obesity. He had mild
13 labored breathing at rest and with walking. I
14 described it as moderate when he was walking at a
15 slow pace. And I have him walk -- most patients
16 who have shortness of breath, I have them walk
17 down our hallway, which is a 50-foot hallway. He
18 had some mild increased AP diameter of the chest
19 and mild hyperresonance on exam. If I just put
20 one arrow, that indicates mild to me for my
21 records.
22        I indicated that he had expiratory
23 wheezing and he had diminished breath sounds
24 bilateral. He had prolonged expiration. Mild

1  abdominal obesity. And the remainder of the exam
2  I indicated was normal.
3  Q.     Did you take an oxygen saturation on
4  Mr. Stults?
5  A.     Yes. It was 95 percent on room air at
6  rest. That's on the front of the first page.
7  Q.     Okay. And is that within the range of
8  normal?
9  A.     Yes.
10 Q.     Did you have any concerns for
11 Mr. Stults' oxygen saturation after exertion?
12 A.     I did not measure an exertional oxygen
13 saturation.
14 Q.     Did Mr. Stults ever complain to you
15 that he passed out or had any signs or symptoms of
16 hypoxia related to his dyspnea on exertion?
17 A.     I don't recall that specifically.
18 Q.     Did Mr. Stults describe to you any
19 mental status changes that he had?
20 A.     I don't recall any.
21 Q.     Did Mr. Stults describe to you any
22 complaints he had of cognitive deficits or
23 difficulties?
24 A.     Not that I recall.

1  Q.     Did Mr. Stults have any difficulty in
2  providing you -- strike that.
3         You also did -- I think we already --
4  we had just marked it, it was a -- he had a CT
5  scan done when Mr. Stults came in to see you?
6  A.     That's correct.
7  Q.     CT of the chest without contrast?
8  A.     That's correct.
9  Q.     And did you do inspiratory and
10 expiratory views?
11 A.     Yes. It was a high resolution.
12        MR. KAWALA: All right. Exhibit 5, I
13 don't know if you've got a copy of it or not.
14        THE WITNESS: Can I get my chart back?
15        MR. ALLEN: I knew it wouldn't last
16 long.
17        THE WITNESS: Thank you. I'm actually
18 going to put this back in so it doesn't get lost.
19        MR. KAWALA: I'm going to have another
20 one for you in a second, but go ahead.
21        THE WITNESS: I just don't want to lose
22 anything.
23        MR. KAWALA: Right.
24        THE WITNESS: All right. Yes, I do

1  have it here, Exhibit 5.
2  BY MR. KAWALA:
3  Q.     Okay. Based upon the HRCT that was
4  done when Mr. Stults came in to see you, what were
5  the relevant findings? This is Exhibit 5.
6  A.     The radiologist indicated borderline
7  bronchiectasis changes in the bilateral lower
8  lobes -- or lower lung fields he described. Mild
9  heterogeneous attenuation on expiration images
10 without definite air trapping.
11 Q.     What's the significance to the
12 borderline bronchiectasis?
13 A.     That's a finding that is seen in
14 bronchiolitis obliterans and is an abnormality of
15 the lungs.
16 Q.     Is there anything remarkable about that
17 finding that tells you that it's the result of
18 diacetyl exposure or not?
19 A.     That is not specific to diacetyl. It
20 is a finding that is seen in diacetyl exposure.
21 Q.     Okay. Would you find the same type of
22 finding in idiopathic bronchiolitis obliterans or
23 bronchiolitis obliterans caused by connective
24 tissue disease?

1  A.     It can be seen in any patient with
2  bronchiolitis obliterans of any cause.
3  Q.     Okay. Non-specific mild heterogenous
4  attenuation. What do you mean by attenuation?
5  A.     Attenuation means differences in the
6  density of the lung tissue indicating different
7  amounts of air versus tissue.
8  Q.     Any pattern to that attenuation?
9  A.     This would be consistent with a mosaic
10 pattern when we say heterogenous attenuation.
11 Q.     Mosaic pattern is sort of a 50/50
12 finding in bronchiolitis obliterans, isn't it?
13 A.     That's correct.
14 Q.     It's not diagnostic or pathognomonic
15 for anything, is it?
16 A.     It's a finding that is 50/50 present,
17 but when present is supportive of a diagnosis of
18 bronchiolitis obliterans.
19 Q.     And it's often seen in bronchiolitis
20 obliterans with -- with multiple causes?
21 A.     It's a finding of bronchiolitis
22 obliterans independent of the cause.
23 Q.     Okay. Any reference in the HRCT report
24 to a mosaic pattern being present?

1  related to his current illness. He can't exercise
2  anymore. He's short of breath walking to the
3  mailbox. Gaining weight. He gained 15 to 20
4  pounds in the year that I saw him in 2011. By his
5  description.
6  Q.   Okay. Are you going to offer any
7  opinions on depression and anxiety?
8  A.   No.
9  Q.   Okay. Is that all the handwritten
10 notes?
11 A.   That's all my handwritten notes, yes.
12      MR. BENSON: Can I just ask, on page 4,
13 where it says, goes up and down and ragweed, is
14 that also you or did he fill that out?
15      THE WITNESS: No, that's his
16 handwriting, not mine.
17      MR. BENSON: Okay. Thank you.
18 Q.   I think now we've gone through
19 everything that we had copies made of. So that's
20 good. I may just get back to my outline and see
21 what else I need to cover with you, Doctor.
22 A.   Sure.
23 Q.   Do you have any opinion as to what
24 level of consumer exposure is necessary to

1  diacetyl to result in BO?
2  A.   I do not know the value of that.
3  Q.   Do you have any opinion as to how much
4  diacetyl Mr. Stults was exposed to either on a
5  bag-per-bag or yearly or any basis over the
6  history of his alleged exposure?
7  A.   No, I do not.
8  Q.   Are you aware of any literature
9  describing consumers contracting bronchiolitis
10 obliterans due to inhalation of diacetyl besides
11 the Egilman article?
12 A.   No.
13 Q.   Do you recall that Dr. Egilman
14 published that article in a journal he is the
15 editor and owner of?
16 A.   No, I did not know that.
17 Q.   Do you know of anyone besides
18 Dr. Egilman who has ever written in any of the
19 peer-reviewed literature that consumers of
20 microwave popcorn containing diacetyl have an
21 inhalation risk of lung damage?
22 A.   You were asking written? Written
23 documentation of that?
24 Q.   Any peer-reviewed literature that

1  you're aware of.
2  A.   I have not seen any others.
3  Q.   Is there any other writings you've
4  seen, setting aside expert reports in litigation,
5  that assert that consumers of diacetyl are --
6  consumers of microwave popcorn are at risk of
7  obstructive lung damage due to inhalation of
8  diacetyl?
9  A.   I haven't seen those, no.
10 Q.   And I think we discussed it before, but
11 is there a dose-response relationship regarding
12 the amount of diacetyl in microwave popcorn that
13 would result in lung injury?
14 A.   I don't know what the safe level is, so
15 I'm not sure what the dose-response curve looks
16 like.
17 Q.   Okay. So by saying you don't know if
18 it's a dose-response relationship, are you saying
19 that a very negligible amount of diacetyl could
20 result in obstructive lung damage to a consumer?
21 A.   I don't know what the safe threshold
22 is, so I don't know what a negligible amount is.
23 Q.   Okay. Do you assume that there is,
24 however, a dose-response relationship between

1  microwave popcorn containing diacetyl inhalation
2  by a consumer and bronchiolitis obliterans?
3       MR. HALL: Object to the form. Asked
4  and answered.
5  A.   I don't assume anything. I don't know
6  what the safe values are.
7  Q.   Okay. Since you don't know what the
8  dose is or the duration is, I take it you have no
9  opinions specifically as to when pathologic or --
10 or other changes in the lung occur following
11 exposure?
12 A.   I don't know what the time frame is to
13 when that occurs, if that's the question.
14 Q.   Yes, sir.
15 A.   Okay. I don't know the exact time
16 frame of that.
17 Q.   And depending on which exposure history
18 we take, let's work with the newest one,
19 Mr. Stults claims that he was first exposed to
20 microwave popcorn containing diacetyl in 1987.
21 A.   That is the information he gave me,
22 yes.
23 Q.   And to the best of your knowledge,
24 Mr. Stults had no signs, symptoms or complaints

1 diagnosis is for Mr. Stults' condition?
2 A. I've read the notes, but as I
3 mentioned, I did not take notes as I was scanning
4 through the most recent records.
5 Q. Okay. And I have them at hand here if
6 that would refresh your recollection.
7 While I'm digging for that, can
8 bronchiolitis obliterans be idiopathic?
9 A. Yes.
10 Q. And idiopathic simply means there's no
11 cause?
12 A. Idiopathic means it's the cause that we
13 haven't figured out what it is yet. It means you
14 haven't identified a known cause.
15 Q. Okay. And is some portion or
16 percentage of bronchiolitis obliterans that occurs
17 in the United States population idiopathic?
18 A. Yes. As I said before, it just means
19 that you haven't figured out the cause for that
20 particular patient yet.
21 Q. Can you give me any sense, even in a
22 ballpark sense, of what proportion of
23 bronchiolitis obliterans could be fairly
24 characterized as idiopathic?

1 A. I don't know the percentage. In my
2 clinical practice, I almost always have had a
3 cause in patients that I've seen.
4 Q. Is the fact that a treating physician
5 hypothesized a cause, does that mean that the
6 bronchiolitis obliterans isn't idiopathic?
7 A. For something to be defined as
8 idiopathic means that there's no other
9 identifiable likely causes for the disease
10 process. So if the physician feels that there is
11 a cause, that's potentially -- that's the cause.
12 Q. And whether that physician's opinion is
13 correct or incorrect -- I'm trying to think if
14 there's a better way to state it.
15 If a physician incorrectly believes
16 that somebody's bronchiolitis obliterans is caused
17 by diacetyl inhalation, when it's not, does that
18 mean that -- strike that.
19 I can't put it in the form of a
20 question.
21 Were you aware that Dr. Schmitt
22 maintained three differential diagnoses for
23 Mr. Stults, one being consumer exposure to
24 diacetyl, another being idiopathic, and another

1 being autoimmune rheumatoid arthritis?
2 A. I did see that on the record, yes.
3 Q. Do you have any -- any criticism of
4 Dr. Schmitt's differential diagnosis?
5 Do you think any of those differential
6 diagnoses are wrong or improper in this case?
7 A. Well, as I stated previously,
8 idiopathic, I only call something idiopathic if
9 I've excluded all reasonable possibilities.
10 And with regard to RA, with regard to
11 the literature -- to the records that I reviewed
12 on this case, this did not appear to be consistent
13 with an RA illness associated with lung disease.
14 Q. So do you think that based on the fact
15 that you believe records support a diagnosis that
16 Mr. Stults' bronchiolitis obliterans was caused by
17 exposure to diacetyl, do you disagree with the
18 inclusion of idiopathic bronchiolitis obliterans
19 in Dr. Schmitt's medical record?
20 A. I do.
21 Q. Setting aside the fact that Mr. Stults
22 has been exposed to diacetyl in microwave popcorn
23 based upon the history and the revised history
24 that he gave you, is there any other pathognomonic

1 or footprint or remarkable finding that you can
2 point to that indicates that BO caused his or was
3 caused by diacetyl?
4 A. The history is an important part of
5 obtaining a diagnosis, and I was not able to
6 identify any other causes. I went through
7 chemical exposure, work exposures, lung injuries,
8 infections, and did not come to any other causes.
9 And he had the long history of diacetyl exposure
10 that he described.
11 Q. Isn't it true that the people for --
12 for a long time, for decades, people have been
13 diagnosed with bronchiolitis obliterans where
14 there is -- has been no known chemical exposure,
15 no infections, no external causes?
16 A. Well, that's the idiopathic ones. And
17 that's become less and less frequent as we define
18 exposures that do lead to bronchiolitis
19 obliterans.
20 Q. Okay. Besides Mr. Stults' history, is
21 there any other way to distinguish his condition
22 of bronchiolitis obliterans secondary to diacetyl
23 exposure from idiopathic bronchiolitis obliterans?
24 A. Bronchiolitis obliterans does not look

1  different in different -- in patients from
2  different causes.
3  Q.    So would you agree that the basis for
4  your opinion that Mr. Stults has bronchiolitis
5  obliterans secondary to diacetyl exposure is based
6  upon the history that Mr. Stults provided to you
7  of exposure to diacetyl in microwave popcorn?
8         MR. HALL: Object to the form. Asked
9  and answered.
10 A.    That's -- that's a component of the
11 diagnosis. The other part of it is the findings,
12 the physical findings, the X-rays, the PFTs,
13 physical exam. That's all the confirmational
14 findings of bronchiolitis obliterans and then the
15 history that he had exposure that would cause it.
16 Q.    But the clinical findings, the
17 radiology findings, the PFT findings, I think you
18 testified already, all of that clinical
19 information simply documents that he has BO. It
20 doesn't document that he has BO due to diacetyl
21 exposure, correct?
22 A.    That's correct.
23 Q.    And just for purposes of a hypothetical
24 question, if Mr. Stults had never consumed a bag

1  of microwave popcorn and had never been exposed to
2  diacetyl, then, of course, your opinion would be
3  that exposure to diacetyl would be excluded from
4  the differential?
5  A.    That's correct.
6  Q.    And the reason that exposure to
7  diacetyl is included in your differential, and is,
8  in fact, your diagnosis, is based upon Mr. Stults'
9  history?
10 A.    That's correct.
11 Q.    And would you agree with me that
12 Mr. Stults' history as to when he has consumed
13 microwave popcorn and as to how much microwave
14 popcorn he's consumed has been -- has differed
15 from time to time?
16 A.    Can you say that again to make sure I
17 answer it correctly?
18        MR. KAWALA: Go ahead.
19        (The record is read back as requested.)
20        THE WITNESS: He did provide a
21 different history to me in July of 2011 than he
22 did on September 10th, 2013.
23 BY MR. KAWALA:
24 Q.    And if I understand your testimony

1  correctly, if Mr. Stults was assumed to have
2  bronchiolitis obliterans secondary to rheumatoid
3  arthritis, or other connective tissue disease,
4  that the clinical findings, the PFTs, the
5  radiology findings would pretty much look the same
6  as what he's got?
7  A.    Can you read back the question again?
8  Or rephrase it?
9  Q.    Let me rephrase it.
10 A.    There's a lot there.
11 Q.    What I'm trying to do is set aside the
12 history. If you assume that Mr. Stults has --
13 strike that.
14       If a patient has bronchiolitis
15 obliterans due to -- secondary to rheumatoid
16 arthritis or a connective tissue disease, would
17 the -- would the PFT results, would the complaints
18 of shortness of breath, cough, chest X-ray, would
19 those -- could those all look the same as what
20 Mr. Stults has?
21 A.    Bronchiolitis obliterans for many
22 causes will have similar findings on those
23 objective findings.
24 Q.    Okay. What's the -- what's the

1  accepted accuracy of a positive CCP test for the
2  presence of rheumatoid arthritis?
3  A.    You mean the specificity?
4  Q.    Yes, sir.
5  A.    Specificity is reported at 98 percent,
6  I believe, 95 percent, somewhere in that range.
7  Q.    Does Mr. Stults have a family history
8  of rheumatoid arthritis?
9  A.    I believe his mother may have had
10 rheumatoid arthritis. Let me look.
11 Q.    I think you're correct.
12 A.    Yeah.
13 Q.    Just for the record, where -- what are
14 you referring to?
15 A.    I'm looking back through my history
16 that I obtained from him.
17       I didn't have it written down. He
18 didn't -- he said his mother had hypertension, but
19 I think I might have read it in one of the other
20 records, in the rheumatologist's records, that
21 there was a family history of rheumatoid arthritis
22 in his mother.
23 Q.    Is rheumatoid arthritis known to have a
24 hereditary or genetic frequency associated with

Page 314

1  brands of microwave butter-flavored popcorn that
2  he and his wife consumed?
3  A.     He -- if he had told me specific
4  brands, I would have put it into the report, as I
5  have not made a habit of specifically asking
6  people what brands they were exposed to.
7  Q.     Why not?
8  A.     I just never thought to do that.
9  Q.     Okay. If you would, take a look at
10 Exhibit 10.
11 A.     Would you like me to do that in the
12 future?
13        Which is Exhibit 10?
14 Q.     Far be it from me to tell you what to
15 do, Doctor.
16        It's this.
17 A.     Okay. The questionnaire.
18 Q.     Page 2.
19 A.     Yes.
20 Q.     Your handwritten note at the bottom.
21 1991, daughter born. Wife put baby to bed. He
22 popped two bags microwave butter lovers popcorn
23 every night.
24        Do you see that?

Page 315

1  A.     Yes.
2  Q.     Are you aware that Butter Lovers is
3  actually a brand --
4  A.     I was not aware of that.
5  Q.     -- of popcorn?
6         Did he -- so in the con- -- was that
7  his language --
8  A.     Yes.
9  Q.     -- that he used? Butter lovers?
10 A.     Yes.
11 Q.     Okay. And then my last question for
12 you, Dr. Pue, is, do you currently hold any
13 opinions that are germane to this case that you
14 have not either testified to during the course of
15 this deposition or that are contained in your
16 written report?
17 A.     To my knowledge, I've shared with you
18 my full opinions.
19 Q.     And as you sit here today, there aren't
20 any additional opinions that you currently have in
21 your head that you expect to testify to at trial
22 that we haven't either talked about or that you
23 haven't written down in your report?
24        That's a true statement?

Page 316

1         MR. HALL: That's two questions.
2         MR. BENSON: You're right, that is two
3  questions.
4  Q.     But was that a true statement?
5  A.     That is a true statement. There's
6  nothing else besides what's in my report or what
7  we've talked about today.
8         MR. BENSON: Dr. Pue, you and I haven't
9  had a chance to meet until day. It was a pleasure
10 meeting you. Thank you for your testimony.
11        THE WITNESS: Thank you.
12        MR. ALLEN: Emily?
13        MS. FITZGERALD: I don't have anything.
14        MR. ALLEN: I think we're finished
15 then. Thank you.
16        THE WITNESS: Thank you.
17        I waive.
18        (Signature waived.)
19        - - - - -
20        Thereupon, the foregoing proceedings
21 concluded at 3:50 p.m.
22        - - - - -
23
24

1  State of Ohio        :    C E R T I F I C A T E
   County of Franklin:  SS
2
   I, Kathryn E. Cathell, RMR, CRR, a Notary
3  Public in and for the State of Ohio, certify that
   Charles A. Pue, M.D. was by me duly sworn to
4  testify to the whole truth in the cause aforesaid;
   testimony then given was reduced to stenotype in
5  the presence of said witness, afterwards
   transcribed by me; the foregoing is a true record
6  of the testimony so given; and this deposition was
   taken at the time and place specified on the title
7  page.
8         Pursuant to Rule 30(e) of the Federal Rules of
   Civil Procedure, the witness and/or the parties
9  have waived review of the deposition transcript.
10        I certify I am not a relative, employee,
   attorney or counsel of any of the parties hereto,
11 and further I am not a relative or employee of any
   attorney or counsel employed by the parties hereto,
12 or financially interested in the action.
13        IN WITNESS WHEREOF, I have hereunto set my hand
   and affixed my seal of office at Columbus, Ohio, on
14 September 23, 2013.
15
16
17
18                                  *Kathy Cathell* (signature)
19
20 _____
   Kathryn E. Cathell, Notary Public - State of Ohio
21 My commission expires December 11, 2014.
22
23
24