**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

DAVID STULTS and BARBARA
STULTS,

        Plaintiffs,

vs.

INTERNATIONAL FLAVORS AND
FRAGRANCES, INC. and BUSH
BOAKE ALLEN, INC.,

        Defendants.

No. C11-4077-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING
DEFENDANTS' MOTIONS FOR
PARTIAL SUMMARY JUDGMENT**

_____

## TABLE OF CONTENTS

*I.*   *INTRODUCTION*.................................................................... 2
    *A.*   *Factual Background* ................................................... 2
    *B.*   *Procedural Background* .............................................. 2

*II.*   *LEGAL ANALYSIS* ................................................................ 4
    *A.*   *Summary Judgment Standards*..................................... 4
    *B.*   *Failure To Warn* ...................................................... 7
        *1.*   *Proximate cause requirement* ............................. 7
        *2.*   *Changing ConAgra's warnings*.......................... 9
        *3.*   *Changing David's behavior* .............................. 14
        *4.*   *Sophisticated user defense*................................ 16
    *C.*   *Implied Warranty Claims* ......................................... 20
    *D.*   *Design Defect Negligence Claims* .............................. 21

*III.*   *CONCLUSION* ..................................................................... 24

In this diversity action under Michigan products liability law, plaintiffs allege that David Stults developed "popcorn lung" by consuming multiple bags of microwave popcorn daily for several years. Presently, I am asked to determine whether the plaintiffs are entitled to present to a jury their failure to warn, implied warranty, and design defect negligence claims. These questions, and others, are presented by the defendants' motions for partial summary judgment.

## I.    INTRODUCTION

### A.    Factual Background

I incorporate by reference the detailed factual background found in my December 24, 2013, Memorandum Opinion and Order Regarding Defendants' Motions For Summary Judgment. I will discuss additional factual allegations, and the extent to which they are or are not disputed or material, if necessary, in my legal analysis.

### B.    Procedural Background

On August 23, 2011, plaintiffs David Stults and Barbara Stults filed their First Amended Complaint against several manufacturers and distributors of microwave popcorn and several suppliers of butter flavorings containing diacetyl.[1] The Stults allege claims of strict liability, negligence, breach of warranty, and loss of consortium. The Stults' claims all stem from David's alleged respiratory injury resulting from his exposure to popcorn containing butter flavorings containing diacetyl. The parties are before me by virtue of diversity of citizenship. *See* 28 U.S.C. § 1332.

---

[1]All of the manufacturers and distributors of microwave popcorn and all of the suppliers of butter flavorings except Bush Boake, Inc. and International Flavors, Inc. have been dismissed.

On December 23, 2013, I granted defendant Bush Boake Allen, Inc. and International Flavors & Fragrances Inc.'s (collectively, "defendants") Joint Motion For Partial Summary Judgment on Plaintiffs' Strict Liability Claim. I also granted defendants' Joint Motion For Partial Summary Judgment as to Counts II-IV Based on Michigan's Three-Year Statute Of Limitations. In my summary judgment order, I initially determined that the substantive legal issues were governed by Michigan law.[2] I then held that the Stults' strict liability claim was not viable because Michigan does not recognize a strict liability theory of recovery. I then went on to hold that both the Stults' negligence and breach of implied warranty claims were time barred. Finally, I also granted summary judgment as to Barbara's loss of consortium claim because it was a derivative claim that could not survive without a viable cause of action against defendants. My decision rendered both defendants' Joint Motion For Partial Summary Judgment Regarding Failure To Warn (docket no. 156) and Joint Motion For Partial Summary Judgment On Plaintiffs' Negligence (Design Defect) and Breach of Implied Warranty Claim (docket no. 161) moot.

The Stults responded by filing a motion to reconsider. In their motion, the Stults argued, under Michigan law, a statutory discovery rule found in Michigan Compiled Laws § 600.5833 applies to their implied warranty claims, and that their implied warranty claims were timely filed under that statute. I granted the Stults' motion to reconsider. I concluded that Michigan Compiled Laws § 600.5833 tolls the accrual of the statute of limitations for breach of warranty claims until the breach is discovered. I further found that, because David was not diagnosed with bronchiolitis obliterans until 2009, the Stults could not have reasonably discovered that they had a possible cause of action until that

_____

[2]Having previously resolved the choice-of-law question, I will not revisit that issue and will again apply Michigan law in my analysis.

time.  Since the Stults filed their Complaint on August 24, 2011, absent merger of the Stults' negligence and breach of warranty claims, the Stults' breach of warranty claims were timely filed under the statutory discovery rule in § 600.5833.  Finally, I determined that the Stults' breach of implied warranty claims did not merge with their negligence claims pretrial.  In reaching this conclusion, I rejected defendants' argument that the Michigan Supreme Court's decision in *Prentis v. Yale Manufacturing Co.*, 365 N.W.2d 176 (Mich. 1984), necessitated the merger of the Stults' negligence and implied warranty claims pretrial.  Therefore, I reversed that part of my December 24, 2013, order granting summary judgment to defendants on the Stults' implied warranty claims.  Having reversed that part of my summary judgment order, I also reversed my conclusion that Barbara's derivative loss of consortium claim fails as a matter of law.  My decision also had the effect of reviving both defendants' Joint Motion For Partial Summary Judgment Regarding Failure To Warn and Joint Motion For Partial Summary Judgment On Plaintiffs' Negligence (Design Defect) and Breach of Implied Warranty Claim.  Those motions are currently before me.

## II.   LEGAL ANALYSIS

### A.   Summary Judgment Standards

Motions for summary judgment essentially "define disputed facts and issues and . . . dispose of unmeritorious claims [or defenses]."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 585 (2007) (internal quotation marks and citation omitted); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses. . . .").  Summary judgment is only appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no *genuine* issue of *material* fact and that the moving party is

entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c) (emphasis added); *see Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) ("Summary judgment is appropriate if viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.").

A fact is *material* when it "'might affect the outcome of the suit under the governing law.'" *Johnson v. Crooks*, 326 F.3d 995, 1005 (8th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Thus, "the substantive law will identify which facts are material." *Anderson*, 477 U.S. at 248. An issue of material fact is *genuine* if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question," *Woods*, 409 F.3d at 990 (quoting *Anderson*, 477 U.S. at 248); *see Diesel Machinery, Inc. v. B.R. Lee Indus., Inc.*, 418 F.3d 820, 832 (8th Cir. 2005) (stating genuineness depends on "whether a reasonable jury could return a verdict for the non-moving party based on the evidence").

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue," *Hartnagel,* 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323), and demonstrating that it is entitled to judgment according to law. *See Celotex*, 477 U.S. at 323 ("[T]he motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied."). Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e);

*Mosley v. City of Northwoods, Mo.*, 415 F.3d 908, 910 (8th Cir. 2005) ("The nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.'" (quoting *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995))).

As the Eighth Circuit Court of Appeals has explained,

> "On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.'" *Ricci v. DeStefano*, ---U.S. ----, 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009) *quoting Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (internal quotations omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000), *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts," and must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Ricci*, 129 S. Ct. at 2677, *quoting Matsushita*, 475 U.S. at 587, 106 S. Ct. 1348.

*Torgerson v. City of Rochester*, 643 F.3d 1031, 1042-43 (8th Cir. 2011) (*en banc*).

Summary judgment is particularly appropriate when only questions of law are involved, rather than factual issues that may or may not be subject to genuine dispute. *See, e.g., Cremona v. R.S. Bacon Veneer Co.*, 433 F.3d 617, 620 (8th Cir. 2006). Consequently, I turn to consider the parties' arguments for and against summary judgment.

### B. Failure To Warn

Defendants make three arguments for summary judgment on the Stults' failure to warn claims against them. First, defendants contend that the Stults cannot establish proximate cause for their failure to warn claim because they cannot establish that, but for defendants' failure to warn ConAgra about the potential health risks associated with defendants' butter flavorings containing diacetyl, ConAgra would have changed the warnings on its microwave popcorn products, thus allowing its customers to avoid injury.[3] Second, defendants contend that the Stults' failure to warn claim fails because the Stults cannot prove that a different warning on their products would have had any impact on David's actions. Finally, defendants argue that they are not liable as a matter of law pursuant to the sophisticated user doctrine. I will take up each of defendants' arguments in turn.

#### 1. Proximate cause requirement

Under Michigan law, a manufacturer has a duty to warn of dangers associated with the intended uses or reasonably foreseeable misuses of a product.[4] *Gregory v.*

---

[3] While David ate several different microwave popcorn brands, the only brand of microwave popcorn David ate that contained any of defendants' butter flavorings containing diacetyl was ConAgra's Orville Redenbacher Butter. The butter flavorings that defendants manufactured for use in Orville Redenbacher Butter were flavors Bush Boake no. 39536 a/k/a International Flavors no. 10806906, and Bush Boake no. 85352 a/k/a International Flavors no. 10807852. Defendants stopped selling butter flavorings containing diacetyl, including the Orville Redenbacher flavors, by January 2005.

[4] A manufacturer's duty to warn is not unlimited. *See Glittenberg v. Doughboy Recreational Indus.*, 491 N.W.2d 208, 212–13 (Mich. 1992). Manufacturers do not have a duty to warn of dangers associated with a product that are obvious or should be obvious to a reasonably prudent user. *See* MICH. COMP. LAWS 600.2948(2) ("A defendant is not

*Cincinnati Inc.*, 538 N.W.2d 325, 329 (Mich. 1995); *see Allen v. Owens-Corning Fiberglass Corp.*, 571 N.W.2d 530, 535 (Mich. Ct. App. 1997); *Portelli v. I.R. Constr. Prods. Co.*, 554 N.W.2d 591, 596 (Mich. Ct. App. 1996); *Peck v. Bridgeport Machs., Inc.*, 237 F.3d 614, 618 (6th Cir. 2001). In order to be establish a failure to warn claim, a plaintiff must prove that the manufacturer:

> (1) had actual or constructive knowledge of the alleged danger, (2) had no reason to believe that consumers would know of this danger, and (3) failed to exercise reasonable care to inform consumers of the danger.

*Hollister v. Dayton Hudson Corp.*, 201 F.3d 731, 741 (6th Cir. 2000) (citing *Piercefield v. Remington Arms Co.*, 133 N.W.2d 129, 134 (Mich.1965)). A plaintiff must also establish causation and damages. *See Spencer v. Ford Motor Co.*, 367 N.W.2d 393, 396 (Mich. Ct. App. 1985); *see also Fisher v. Kawasaki Heavy Indus., Ltd.*, 854 F. Supp. 467, 472 (E.D. Mich. 1994). "[T]o establish a prima facie case that a manufacturer's breach of its duty to warn was a proximate cause of an injury sustained, a plaintiff must present evidence that the product would have been used differently had the warnings been given." *Mascarenas v. Union Carbide*, 492 N.W.2d 512, 517 (Mich. Ct. App. 1992), *overruled in part on other grounds, Buckler v. Automatic Lawn Sprinkler Co.*, 738 N.W.2d 664 (Mich. 2007); *see Ferlito v. Johnson & Johnson Prods., Inc.*, 771 F. Supp.

---

liable for failure to warn of a material risk that is or should be obvious to a reasonably prudent product user or a material risk that is or should be a matter of common knowledge to persons in the same or similar position as the person upon whose injury or death the claim is based in a product liability action."). In addition, a manufacturer has no duty to warn of unforeseeable uses of a product. *See Trotter v. Hamill Mfg. Co.*, 372 N.W.2d 622 (Mich Ct. App. 1985); *see also* MICH. COMP. LAWS § 600.2948(3) (A manufacturer or seller cannot be held liable under a failure-to-warn theory "unless the plaintiff proves that the manufacturer knew or should have known about the risk of harm based on the scientific, technical, or medical information reasonably available at the time the specific unit of the product left the control of the manufacturer").

196, 199 (E.D. Mich. 1991); *see also Van Dike v. AMF Inc.*, 379 N.W.2d 412, 416 (Mich. Ct. App. 1985); *Dunn v. Lederle Labs.*, 328 N.W.2d 576, 582 (Mich. Ct. App. 1982).

### 2. *Changing ConAgra's warnings*

As noted above, defendants contend that the Stults cannot establish proximate cause for their failure to warn claim because they cannot establish that, but for defendants' failure to warn ConAgra about the potential health risks associated with defendants' butter flavorings containing diacetyl, ConAgra would have changed the warnings on its microwave popcorn products, thus causing David to avoid injury.

It is a well-settled maxim under Michigan law that the adequacy of a warning is a question for the trier of fact. *See Pettis v. Nalco Chem. Co.*, 388 N.W.2d 343, 348 (Mich. Ct. App. 1996) ("The adequacy of a warning is a question for the trier of fact."); *Taylor v. Wyeth Labs.*, 362 N.W.2d 293, 298 (Mich. Ct. App. 1984) ("This Court has repeatedly held that the adequacy of a warning and the reasonableness of a failure to warn are questions of fact."); *Fabbrini Family Foods, Inc. v. United Canning Corp.*, 280 N.W.2d 877, 883 (Mich. Ct. App. 1979) ("The adequacy of a warning is a question for the trier of fact."); *Gutowski v. M. & R. Plastics & Coating, Inc.*, 231 N.W.2d 456, 461 (Mich. Ct. App. 1975) ("The adequacy of the warning is usually a question for the jury."); s*ee also Dunn*, 328 N.W.2d at 580 (explaining that the adequacy of a warning is an issue of reasonableness, and reasonableness is a question of fact.).

The summary judgment record, considered in the light most favorable to the Stults, contains significant information and circumstances regarding the risk of diacetyl, and butter flavorings products containing diacetyl, all of which was either known by defendants or easily ascertainable. I briefly review some of that information and those circumstances.

Defendants are members of the Flavor and Extracts Manufacturers' Association ("FEMA"), a trade association. As FEMA members, defendants had access to health hazard information published by FEMA. Among the health hazard information FEMA publishes for its members are Flavor and Fragrance Ingredient Data Sheets ("FFIDS") and Material Safety Data Sheets ("MSDS") for the flavoring chemicals. In 1985, FEMA issued a FFIDS for diacetyl which stated that, upon inhalation, diacetyl was "harmful" and high concentrations were "capable of producing systemic toxicity." FFIDS at 2; Plaintiffs' App. at 62.

By 1992, FEMA member Givaudan discovered that some of its employees had been diagnosed with bronchiolitis obliterans and that one of its employees may have died as a result. This discovery led to the creation of an internal task force to investigate the potential for lung injury at the Givaudan plant. In 1992, Givaudan established safety procedures including the use of respirators for workers exposed to diacetyl or products containing diacetyl. In 1993, the Givaudan task force reported that diacetyl could be a cause of bronchiolitis obliterans and further studies should be conducted. In 1994, Dr. Stuart Brooks, M.D., a specialist retained by Givaudan as part of its investigation, confirmed the bronchiolitis obliterans diagnosis in two Givaudan employees. Dr. Brooks recommended steps to continue the investigation to determine the cause and prevent further bronchiolitis obliterans cases. In 1994, Givaudan retained specialists from the University of Cincinnati to investigate the level of lung disease among Givaudan employees. The specialists included Roy McKay, a pulmonary toxicologist, Dr. James Lockey, M.D., an occupational physician, and Dr. Susan Pinney, Ph.D., an epidemiologist. On July 22, 1996, Mike Davis, Givaudan's President, and Nancy Davis, Givaudan's toxicologist, met with John Halligan, a FEMA attorney and science advisor, to inform FEMA that Givaudan employees had been diagnosed with bronchiolitis obliterans. On September 27, 1996, Karen Duros, Givaudan's General Counsel, and Dr.

Lockey met with Halligan again to educate FEMA on bronchiolitis obliterans and what was happening at the Givaudan plant.

In August 2000, NIOSH performed a Health Hazard Evaluation ("HHE") of the Gilster-Mary Lee microwave popcorn packaging facility in Jasper, Missouri, where there were reported incidents of workplace-related lung disease. NIOSH performed industrial hygiene sampling to measure contaminates. NIOSH also conducted a medical survey of Gilster-Mary Lee plant workers. On August 22, 2001, NIOSH published an interim report regarding its investigation of the Gilster-Mary Lee microwave popcorn packaging facility. NIOSH concluded that "[s]trong exposure-response relationships existed between quartile of estimated cumulative exposures to diacetyl and respirable dust and frequency and degree of airway obstruction." NIOSH Gilster-Mary Lee Report at 2; Defendants' App. at 255. After conducting follow-up testing at Gilster-Mary Lee, NIOSH considered the quality control room to be "an additional high risk area" in which "5 of the 6 workers had airways obstruction." NIOSH Gilster-Mary Lee Letter Report at 2; Plaintiffs' App. at 546. On July 26, 2002, NIOSH issued an interim letter report, noting that: "[Quality control] workers are repeatedly exposed for intervals of several seconds up to several minutes to elevated organic vapor concentrations by work processes throughout the shift." *Id.* NIOSH reported two of the three sources for the vapors was "microwave oven fan exhaust during cooking of the corn" and "bursts of steam and flavoring vapors ejected as bags are opened." *Id.*

On August 2, 2002, NIOSH provided Gilster-Mary Lee with a "Worker Update about NIOSH Testing at Jasper Popcorn." The update noted: "We believe that butter flavoring vapors in the air caused lung disease in workers at this plant." NIOSH Gilster-Mary Lee Worker Update at 1; Plaintiffs' App. at 557. The update also discussed quality control room workers' exposures, observing:

Many quality control workers had abnormal breathing tests and have continued risk even after the ventilation changes in the plant. Based on our survey results, we believe that they may receive many peak exposures to flavoring vapors when microwaving the popcorn bags, opening them, and measuring the amount of hot popcorn. When the popcorn/flavorings temperature increases, the vapors increased, although the high exposures only lasted for seconds or a few minutes. We are concerned about these short peak exposures in the quality control room and have provided recommendations for control.

NIOSH Gilster-Mary Lee Update at 2; Plaintiffs' App. at 558.

By 2003, NIOSH started to conduct investigations at several of ConAgra's microwave popcorn plants. In March 2003, NIOSH conducted a medical survey of ConAgra's workers. NIOSH's survey identified workers with evidence of lung disease of the same type seen in workers who mixed oil and flavorings in other microwave popcorn plants. By the end of 2003, a number of ConAgra workers had filed lawsuits alleging that they suffered lung disease as a result of exposure to butter flavorings.

No one at Bush Boake or International Flavors informed ConAgra that its butter flavorings could cause serious lung injury or bronchiolitis obliterans. Bush Boake's MSDS to ConAgra did not indicate that exposure to Bush Boake's butter flavorings could cause serious lung injury or bronchiolitis obliterans. On August 18, 2004, Michael O'Donnell, ConAgra's Vice President of Ingredients Enterprise Procurements, wrote to International Flavors requesting additional information regarding International Flavors' butter flavorings. O'Donnell wrote in pertinent part:

In fact, the MSDS sheets themselves cause more questions than they answer, because clearly IFF has done some sort of scientific analysis of the butter flavors that they have not shared with ConAgra Foods. I have a series of questions to this point for clarification later in this letter.

Our concern has been greatly heightened over the last several days when on Monday you provided me with the FEMA Respiratory Health and Safety in the Flavor Manufacturing Workplace. Based on just a cursory reading of this Report, it is clear that the flavoring manufacturers have been working for quite some time on analyzing butter flavors and various compounds used to create them, but have failed to provide any of that information to your customers.

Moreover, and even more surprising, was your e-mail to me indicating that your insurance companies will no longer insure butter flavors containing diacetyl for use in microwave popcorn, that you are no longer selling these butter flavors to any of your other microwave popcorn customers, just us, and that you have already started working on new flavors to replace the current butter flavors, without even talking to ConAgra Foods' Research and Development scientists. All this activity is cause for concern, especially changing our butter flavors without consulting with our R&D team when there is no scientific evidence indicating that there is a health hazard to consumers or employees with these butter flavors.

O'Donnell Letter at 1; Plaintiffs' App. at 693. O'Donnell goes on to make the following specific request: "IFF has clearly created a risk assessment associated with diacetyl. Please identify the research data and reports on which this assessment is based." O'Donnell letter at 1; Plaintiffs' App. at 693.

On September 1, 2004, Ronald Senna, International Flavors' Vice President of Corporate Safety, Environmental & Regulatory Affairs, responded to O'Donnell's letter. In response to O'Donnell's question, Senna answered:

IFF has not performed a risk assessment for diacetyl since there is very limited scientific information to allow such an assessment to be performed. In addition, the variability of use of this substances [sic] by our customers does not allow such an assessment to be conducted by IFF since it requires both hazard and customer workplace exposure information which is not available to IFF.

13

Senna Letter at 1-2; Symrise's Supp. App. at 630-31.

There is no material in the summary judgment record that ConAgra was likely to refuse placement of a reasonable warning on their microwave popcorn products. Moreover, a reasonable juror could conclude that the likelihood that ConAgra would convey a warning about the dangers of diacetyl to their microwave popcorn users was reduced or eliminated if defendants withheld information concerning the dangers posed by their butter flavorings from ConAgra. Whether defendants withheld information concerning the dangers posed by their butter flavorings is hotly contested by the parties. Given these circumstances, I conclude that questions of proximate cause, here, are for the jury to determine and deny this portion of defendants' motion.

### 3. *Changing David's behavior*

Defendants also contend that the Stults' failure to warn claim fails because the Stults cannot prove that a different warning on their products would have had any impact on David's actions. The Stults argue that nowhere in the summary judgment record does David state that he would have ignored warnings that the inhalation of fumes while preparing and consuming microwave popcorn could cause severe and permanent lung injury. Resolution of this issue turns on David's deposition testimony.

David testified that he remembers reading the microwave popcorn bags' directions for how long to cook the microwave popcorn. He does not recall looking for any warnings on microwave popcorn bags. He also does not recall any warnings provided on any bags of microwave popcorn he ate between 1988 and 2007. He testified that he does not remember seeing microwave popcorn packaging that mentioned "no added diacetyl" or "no diacetyl added," because "if I had, it would not have resonated with me, because it was not relevant to anything I needed to know." David's Dep. at 78; Defendants' App. at 483. Asked whether he typically read the labels of products before using them, David responded: "In general yes, but I can tell you at the time I was

14

consuming microwave butter-flavored popcorn, I didn't have a sense of what diacetyl was, nor did I care. For all I knew, it was something that would make you fatter or thinner. I had no idea of the correlation to lung disease." David's Dep. at 563; Defendants' App. at 488. David might have seen a microwave popcorn warning telling consumers to allow the popcorn to "cool before opening," but he "thought perhaps this was just another defensive thing the manufacturer is putting on there for whatever reason," similar to how McDonald's warns that its coffee is hot. David's Dep. at 565; Defendants' App. at 488.

Asked whether a warning might have prevented him from inhaling microwave popcorn fumes, David stated: "I would like to think that had there been a warning or if there had been some public notice that butter-flavored microwave popcorn could create these kinds of disastrous effects in the consumer market as it did in the workers' market, I would have liked to have known that." David's Dep. at 525; Defendants' App. at 487. David added, "So in my opinion, had there been some kind of warning on the bag that the fumes of this has been known to cause a non-recoverable disease, I think I would have been much more sensitive to not breathing in the fumes which is where this all came from to begin with." David's Dep. at 525; Defendants' App. at 487.

As previously noted, it is well-settled that questions of proximate cause are ordinarily for the jury. *See Gregory*, 538 N.W.2d at 329. David's deposition testimony does not establish, as a matter of law, that he would have ignored a warning to avoid breathing in the vapors from a freshly popped bag of microwave popcorn. A reasonable juror could conclude that a person would not risk permanent, severe lung damage in order to enjoy breathing in the buttery smelling vapors from microwave popcorn if warned about possible serious consequences. Thus, I conclude that the question of whether or not David would have abided by warnings on microwave popcorn bags is for the jury to determine and deny this portion of defendants' motion.

### 4.    *Sophisticated user defense*

Defendants also contend that, because they sold their butter flavorings to ConAgra, a sophisticated user as defined under Michigan law, MICH. COMP. LAWS § 600.2945(j), defendants cannot be held liable for any alleged failure to warn pursuant to Michigan law. *See* MICH. COMP. LAWS § 600.2947(4). The Stults respond that genuine issues of material fact exist as to whether ConAgra is a sophisticated user under Michigan law. The Stults also argue that even if ConAgra is a sophisticated user, genuine issues of material fact exist over whether or not an exception to the sophisticated user defense applies in this case which precludes me from granting summary judgment on the Stults' failure to warn claim.

Under Michigan law:

> Except to the extent a state or federal statute or regulation requires a manufacturer to warn, a manufacturer or seller is not liable in a product liability action for failure to provide an adequate warning if the product is provided for use by a sophisticated user.

MICH. COMP. LAWS § 600.2947(4).[5] Michigan defines a "sophisticated user" as:

> a person or entity that, by virtue of training, experience, a profession, or legal obligations, is or is generally expected to be knowledgeable about a product's properties, including a potential hazard or adverse effect. An employee who does not have actual knowledge of the product's potential hazard or adverse effect that caused the injury is not a sophisticated user.

MICH. COMP. LAWS § 600.2945(j).

---

[5]The word "product" is defined by Michigan law as including "any and all component parts to a product." MICH. COMP. LAWS § 600.2945(g).

The rationale underlying the sophisticated user defense is that, where a purchaser is a sophisticated user of a product, the purchaser is in the best position to warn the ultimate user of the dangers associated with the product, thus relieving the product's manufacturer from its duty to warn the ultimate user.[6] *See Portelli v. I.R. Constr. Prods. Co., Inc.*, 554 N.W.2d 591, 596 (Mich. Ct. App. 1996); *Rasmussen v. Louisville Ladder Co., Inc.*, 547–48, 536 N.W.2d 221 (Mich. Ct. App. 1995); *Jodway v. Kennametal, Inc.*, 525 N.W.2d 883, 888-89 (Mich. Ct. App. 1994). As the Michigan Court of Appeals explained in *Portelli*:

> a duty to warn a purchaser of the inherent dangers of a product does not arise in a situation where the purchaser is a sophisticated user because a sophisticated user is charged with knowledge of the product. The rationale behind the sophisticated-user doctrine is that the manufacturer markets a particular product to a class of professionals that are presumed to be experienced in using and handling the product. Because of this special knowledge, the sophisticated user will be relied upon by the manufacturer to disseminate information to the ultimate users regarding the dangers associated with the

---

[6]Michigan's sophisticated user defense is subject to Michigan's "actual knowledge exception," MICH. COMP. LAWS § 600.2949a. hat statute provides:

> In a product liability action, if the court determines that at the time of manufacture or distribution the defendant had actual knowledge that the product was defective and that there was a substantial likelihood that the defect would cause the injury that is the basis of the action, and the defendant willfully disregarded that knowledge in the manufacture or distribution of the product, then sections 2946(4), 2946a, 2947(1) to (4), and 2948(2) do not apply.

MICH. COMP. LAWS § 600.2949a (footnote omitted).

> product. Hence, the manufacturer is relieved of a duty to warn.

*Id.* at 596.

The lynchpin of defendants' argument is that ConAgra was a "sophisticated user" of defendants' butter flavorings. In *Aetna Casualty & Surety Co v. Ralph Wilson Plastics Co*, 509 NW2d 520, 523-24 (Mich. Ct. App. 1993), the Michigan Court of Appeals determined that commercial enterprises that use materials in bulk must be regarded as sophisticated users as a matter of law. *Id.* at 523. The court noted that, because the employer had an obligation under the Michigan Occupational Safety and Health Act to make information available to its employees regarding possible dangers of bulk materials, the designation of sophisticated user was appropriate. *Id.* at 524. The court reasoned:

> Those with a legal obligation to be informed concerning the hazards of materials used in manufacturing processes must be relied upon, as sophisticated users, to fulfill their legal obligations, thereby absolving manufacturers in some circumstances of the duty to warn the users of chemical products, where such use is in the course of employment for a sophisticated bulk user. Any other rule would mean that "[m]odern life would be intolerable unless one were permitted to rely to a certain extent on others' doing what they normally do, particularly if it is their duty to do so." 2 RESTATEMENT TORTS, 2d, § 388, comment n, p 308." *Tasca v. GTE Products Corp.*, 175 Mich. App. 617, 624, 438 N.W.2d 625 (1988).

*Id.*

Applying this reason to the summary judgment record, I find that ConAgra is a sophisticated user under Michigan law. ConAgra is one of the largest manufacturers of microwave popcorn in the United States and one of the largest food manufacturers in the world. ConAgra has been in the microwave popcorn business since the 1980's. ConAgra operated microwave popcorn factories in Edina, Minnesota, Hamburg, Iowa, Winslow,

Indiana, Valparaiso, Indiana, and Marion, Ohio. ConAgra has been aware since the early 1990's that butter flavorings contained diacetyl and other volatile organic compounds. Beginning in the 1990's, ConAgra conducted studies of the volatile organic and chemical compounds released when its microwave popcorn was popped. ConAgra has an Environment, Occupation, Health, and Safety Department that is responsible for the health and safety of both ConAgra's workers and its customers. On October 20, 2001, a NIOSH investigator explained to a ConAgra representative the problems experienced at the Gilster-Mary Lee microwave popcorn packaging facility in Jasper, Missouri, in 2000, and NIOSH's investigation regarding the purported link between diacetyl exposure and lung disease. In 2002, ConAgra representatives attended the FEMA workshop on "Respiratory Safety in the Flavor and Fragrance Workplace." FEMA informed attendees of the risks to workers associated with butter flavorings exposure and steps to improve worker health. In 2002, NIOSH received a request for a Health Hazard Evaluation at ConAgra's microwave popcorn plant in Marion, Ohio. NIOSH investigated ConAgra's Marion plant and also its Hamburg, Iowa, plant. As a result of those investigations, NIOSH made recommendations to ConAgra to implement additional protective measures for its workers.

Having found that ConAgra is a sophisticated user, I turn next to the Stults' argument that defendants do not meet Michigan's sophisticated user defense because they failed to comply with a federal regulation, 29 C.F.R. § 1910.1200(g)(5), in the MSDS they provided ConAgra. Section 1910.1200(g)(5) provides that:

> The chemical manufacturer, importer or employer preparing the safety data sheet shall ensure that the information provided accurately reflects the scientific evidence used in making the hazard classification. If the chemical manufacturer, importer or employer preparing the safety data sheet becomes newly aware of any significant information regarding the hazards of a chemical, or ways to protect against the hazards, this new

> information shall be added to the safety data sheet within three
> months. If the chemical is not currently being produced or
> imported, the chemical manufacturer or importer shall add the
> information to the safety data sheet before the chemical is
> introduced into the workplace again.

29 C.F.R. § 1910.1200(g)(5).

The key to whether the sophisticated user defense applies here lies in whether defendants withheld pertinent safety information regarding its butter flavorings from the MSDS they supplied to ConAgra. Obviously, if defendants withheld pertinent safety information from ConAgra, ConAgra could not "disseminate information to the ultimate users regarding the dangers associated with the product." *Portelli,* 554 N.W.2d at 596. As discussed above, defendants' MSDS to ConAgra did not indicate that exposure to their butter flavorings could cause serious lung injury or bronchiolitis obliterans. Thus, viewing the summary judgment record in the light most favorable to the Stults, a reasonable jury could conclude that defendants withheld pertinent safety information from ConAgra and in doing so did not comply with § 1910.1200(g)(5). Accordingly, I conclude that genuine issues of material fact exist on the question of whether defendants qualify for application of Michigan's sophisticated user defense and deny this portion of defendants' motion.

### C.     *Implied Warranty Claims*

Defendants also seek summary judgment on the Stults' implied warranty claims. Defendants argue that the Stults' breach of implied warranty claims merged with their design defect negligence claims. As I noted above, in my order granting the Stults' motion to reconsider, I concluded that the Stults' breach of implied warranty claims did not merge with their design defect negligence claims. Defendants have not directed me to any legal authority which would cause me to reverse that decision. Therefore,

defendants' Joint Motion For Partial Summary Judgment On Plaintiffs' Negligence (Design Defect) and Breach of Implied Warranty Claim is denied as to the Stults' breach of implied warranty claims.

### D. *Design Defect Negligence Claims*

Finally, defendants seek summary judgment on the Stults' design defect negligence claims. Defendants assert that the Stults' design defect claims fail because they have offered no evidence of a reasonable alternative design. The Stults contend defendants' assertion is untrue and that they have put forward evidence that diacetyl-free butter flavorings was a viable alternative design.

The elements of a design defect claim have been codified in Michigan law. *See* MICH. COMP. LAWS § 600.2946(2).[7] To prove a design defect under Michigan law, a plaintiff must show that:

---

[7] Section 600.2946(2) states that:

> In a product liability action brought against a manufacturer or seller for harm allegedly caused by a production defect, the manufacturer or seller is not liable unless the plaintiff establishes that the product was not reasonably safe at the time the specific unit of the product left the control of the manufacturer or seller and that, according to generally accepted production practices at the time the specific unit of the product left the control of the manufacturer or seller, a practical and technically feasible alternative production practice was available that would have prevented the harm without significantly impairing the usefulness or desirability of the product to users and without creating equal or greater risk of harm to others. An alternative production practice is practical and feasible only if the technical, medical, or scientific knowledge relating to production of the product, at

(1) the product was not reasonably safe when it left the control of the manufacturer; and (2) a "feasible alternative production practice was available that would have prevented the harm without significantly impairing the usefulness or desirability of the product to users."

*Croskey v. BMW of N. Am.*, 532 F.3d 511, 516 (6th Cir. 2008) (quoting MICH. COMP. LAWS § 600.2946(2)); *see Gregory v. Cincinnati Inc.*, 538 N.W.2d 325, 329 (Mich. 1995)).  The Sixth Circuit Court of Appeals has held that to meet this test a plaintiff must prove:

"(1) that the severity of the injury was foreseeable by the manufacturer;

(2) that the likelihood of occurrence of her injury was foreseeable by the manufacturer at the time of distribution of the product;

(3) that there was a reasonable alternative design available;

(4) that the available alternative design was practicable;

(5) that the available and practicable reasonable alternative design would have reduced the foreseeable risk of harm posed by the defendant's product; and

(6) that omission of the available and practicable reasonable alternative design rendered defendant's product not reasonably safe."

the time the specific unit of the product left the control of the manufacturer or seller, was developed, available, and capable of use in the production of the product and was economically feasible for use by the manufacturer. Technical, medical, or scientific knowledge is not economically feasible for use by the manufacturer if use of that knowledge in production of the product would significantly compromise the product's usefulness or desirability.

MICH. COMP. LAWS § 600.2946(2).

*Croskey*, 532 F.3d at 516 (quoting *Hollister v. Dayton Hudson Corp.*, 201 F.3d 731, 738 (6th Cir. 2000)).

As noted above, defendants contend that the Stults' design defect claims fail because they have offered insufficient evidence of a reasonable alternative design. The Stults contend that they have put forward evidence that diacetyl-free butter flavorings was a viable alternative design for defendants' butter flavorings with diacetyl. A review of those materials belies that claim. None of the materials cited by the Stults is sufficient to permit a reasonable jury to find that defendants could have produced diacetyl-free butter flavorings for microwave popcorn. For instance, the Stults point to an advertisement from Elan Corporation claiming that its product, Butterome, is a "1:1 Diacetyl Replacement." This advertisement is clearly hearsay. I must base my determination regarding the presence or absence of a material issue of fact on evidence that will be admissible at trial. *Moore v. Indehar*, 514 F.3d 756, 761 (8th Cir. 2008); *Mays v. Rhodes*, 255 F.3d 644, 648 (8th Cir.2001); *Firemen's Fund Ins. Co. v. Thien*, 8 F.3d 1307, 1310 (8th Cir. 1993); *Financial Timing Publications v. Compugraphic Corp.*, 893 F.2d 936, 942 & n. 6 (8th Cir. 1990). Inadmissible hearsay evidence cannot defeat a summary judgment motion. *See Thien*, 8 F.3d at 1310; *Financial Timing Publications*, 893 F.2d at 942 n.6. In addition, even if I considered it, this advertisement, standing alone, does not establish that Butterome was a successful replacement for diacetyl. The Stults' reliance on Richard Lane's testimony is equally unavailing. Lane testified that his company, St. Louis Flavors, formulated "a group of flavors that were of the type that did not contain very high percentage of diacetyl, fairly – fairly low levels of diacetyl." Lane Dep. at 16; Plaintiffs' App. at 809. What's more, St. Louis Flavors never sold any of its butter flavorings for use in microwave popcorn. Lane Dep. at 20; Plaintiffs' App. at 810. Thus, Lane's testimony is insufficient for a jury to conclude that diacetyl-free butter flavorings was a viable alternative design to defendants' products.

Finally, the Stults direct me to the deposition testimony of Doug Knudsen and George Miketa regarding ConAgra's efforts to remove diacetyl from its microwave popcorn products. Both Knudsen and Miketa testified that ConAgra "reformulated" its microwave popcorn products to remove diacetyl. Defendants point out that Miketa testified that he was "not clear" as to the extent of this reformulation, Miketa Dep. at 44; Plaintiffs' App. at 800, and Knudsen similarly testified that it was his "understanding" that the microwave popcorn ConAgra sells has "no added diacetyl" but that "[t[here might be natural diacetyl in certain things. . . ." Knudsen Dep. at 52; Symrise App. at 606. Defendants argue that, because of the ambiguity in Knudsen and Miketa's testimony, the Stults have not pointed to material in the summary judgment record which would permit a jury to conclude that a reasonable alternative design was available to defendants' butter flavorings with diacetyl. I conclude that the weight to be afforded Knudsen and Miketa's testimony is one for the jury to make. Consequently, viewing the summary judgment record in the light most favorable to the Stults, I find that the materials submitted by the Stults are sufficient for a jury to conclude that a reasonable alternative design was available to defendants' butter flavorings with diacetyl. Accordingly, defendants' Joint Motion For Partial Summary Judgment On Plaintiffs' Negligence (Design Defect) and Breach of Implied Warranty Claim is also denied as to the Stults' design defect negligence claim.

## III. CONCLUSION

Accordingly, for the reasons discussed above, it is ordered:

1.     Defendants' Joint Motion For Partial Summary Judgment Regarding Failure To Warn is denied.

2.     Defendants' Joint Motion For Partial Summary Judgment On Plaintiffs' Negligence (Design Defect) and Breach of Implied Warranty Claim (docket no. 161) is denied.

**IT IS SO ORDERED**.

**DATED** this 11th day of July, 2014.

_Mark W. Bennett_
_____
MARK W. BENNETT
U.S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA